ESTATE OF GERALD L. WALLACE, DECEASED, CELIA A. WALLACE, EXECUTRIX, AND CELIA A. WALLACE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22960-88.          Filed November 14, 1990.

*Roland J. Mestayer, Jr., G. Tomas Rhodus,* and *Clark S. Willingham,* for the petitioners.
*Helen C.T. Smith,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1980 and 1983 in the amounts of $303,129 and $566,236, respectively. Dr. Gerald L. Wallace (Dr. Wallace) died on November 13, 1986, prior to the issuance of the notice of deficiency in this case. However, since the years here involved are 1980 and 1983, we will hereinafter refer to Dr. and Mrs. Wallace as petitioners. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following:

(1) Whether the amount of deductions to which Dr. Wallace is entitled for prepaid cattle feed for the years 1980 and 1983 is limited by section 464;[1] and

(2) to what extent were the payments in 1980 to Dr. Wallace, by a corporation of which he was the major stockholder as well as an officer, earned income within the meaning of section 1348.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing the petition in this case Celia A. Wallace (Mrs. Wallace) resided in Mobile, Alabama. Petitioners timely filed a joint Federal income tax return for the calendar year 1980 with the Atlanta, Georgia Service Center. They filed an amended income tax return for 1980 on January 18, 1982, and a second amended income tax return for 1980 on December 31, 1985. On October 15, 1984, petitioners filed a joint Federal income tax return for the

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

calendar year 1983. During the years 1980 through 1985, petitioners were cash basis taxpayers.

Dr. Wallace completed his medical education and various internships in 1964. He entered a family medicine medical practice in that year in Bay Minette, Alabama. Mrs. Wallace has a degree in x-ray technology from the University of Alabama. Dr. and Mrs. Wallace were married in 1966.

By the end of his fifth year of practice, Dr. Wallace was seeing between 75 and 90 patients a day in his office, in addition to seeing approximately 30 hospital patients a day. He began his duties early in the morning and sometimes finished his hospital rounds between midnight and 1 a.m. He spent whatever time he considered necessary with each patient. Dr. Wallace's patient load began to diminish in 1975 as he became more involved in business activities. His hospital admissions also declined.

Although Dr. Wallace's medical practice produced a steady stream of income, petitioners opted to invest their income rather than spend it. Petitioners worked together in their various business undertakings and discussed potential business transactions in detail. Starting in the late 1960s, they examined a number of prospective business ventures with particular emphasis on undeveloped real estate. A brief description of some of the business ventures in which they were involved follows.

Petitioners invested in and developed residential property in St. Thomas, the U.S. Virgin Islands, in 1967 in conjunction with Mrs. Wallace's godfather.

Shortly after commencing the project in St. Thomas, petitioners planned the construction of an apartment complex behind Dr. Wallace's professional office. Dr. Wallace helped to plan the design of the complex, but it was not constructed due to lack of financing.

In 1968, petitioners bought a section of rural land in Mobile County, Alabama. Several years later, a producing oil well was drilled on the property. The area is now referred to as the Chunchula field. Dr. Wallace negotiated an unusual mineral lease contract on the property under which petitioners received a percentage of the net profit from the refining of the oil produced from their land.

As his medical practice developed, Dr. Wallace became dissatisfied with the availability of hospital beds in Mobile County, Alabama, and the patient care given at existing hospitals. He decided to build a new hospital in order to give his patients the best quality medical care. Dr. Wallace located suitable property for construction of the hospital, obtained a certificate of need for the construction of the hospital, and began its construction in the early 1970s. Springhill Memorial Hospital opened its doors in January of 1975 as an acute care facility with 150 beds.

In order to attract physicians to use the facilities of Springhill Memorial Hospital, petitioners arranged for the building of a seven-story medical office building adjacent to the hospital.

While the hospital was under construction, petitioners had constructed a 150-bed nursing home adjacent to the hospital. The nursing facility was completed shortly before the hospital opened. Petitioners individually owned, managed, and operated the nursing home for a period of time after it opened, but later turned the management over to a professional administrator.

In 1969, petitioners joined with a Mr. Charles Vann in the Vann Construction Co. to build an office building on Hartley Road. After building the office building, Vann Construction Co. built schools in Baldwin County, Alabama, and some other counties in Alabama. Vann Construction Co. became unprofitable and was discontinued.

Dr. and Mrs. Wallace had a number of other business interests during the late 1960s, the 1970s, and the early 1980s, including engaging in the commercial fishing business through the ownership of shrimp boats, operating H&W Pipeline Corp., and owning the Battle House Hotel.

Dr. Wallace was founder, controlling shareholder, president, and chairman of the board of directors of Springhill Medical, Inc.; president, controlling shareholder, and chairman of the board of directors of H&W Pipeline Corp., a natural gas transmission company; founder, controlling shareholder, and chairman of the board of directors of Springhill Memorial Hospital, Inc., of Mobile, Alabama, which owned and operated the Springhill Memorial Hospital constructed by petitioners; and founder, president, control-

ling shareholder, and chairman of the board of directors of Chunchula Energy Corp.

Dr. Wallace had a very high energy level. He required only 3 to 4 hours of sleep per night and would work 14 to 20 hours a day, 7 days a week.

## Facts Relating to Prepaid Feed Issue

The term "cattle feeding" applies to the practice of placing cattle in feedlots, feeding the cattle a high protein diet for 3 to 5 months, and then selling the cattle for slaughter. Commercial cattle feeding lots began to develop as an industry in the 1960s. Most of the cattle feeding lots are in Texas, Oklahoma, and New Mexico. Generally the cattle in the lots are not owned by the owners of the feedlots or their employees. Individuals or other entities will purchase cattle, place the cattle at custom feedlots for the required fattening period, and then sell the cattle for slaughter.

The feedlot employees include the feedlot manager, clerical staff, office manager, cowboy-foreman, cowboys, lay doctor, processors, market monitors, and a food mill expert. In addition to employees, a commercial feedlot usually has a nutritionist and a veterinarian as consultants.

The feedlot employees care for the cattle from the moment the cattle are delivered to the feedlot until the moment they are sold for slaughter. Care of the cattle includes daily feeding, maintenance of the cattle's health, treatment of disease, and other activities necessary for the cattle to adequately gain weight during the feeding period. Cattle in the feedlot are segregated into separate pens according to owner, but all cattle in the feedlot at a given time and at a given stage of development are treated exactly the same.

The ultimate authority in a commercial feedlot is the feedlot manager. The feedlot manager and supervisors make all the decisions regarding the hiring and firing of employees on the feedlot. Individual cattle owners have no authority to hire or fire any employees. If an owner is displeased with the treatment his cattle receive at a particular feedlot, he can speak with the feedlot manager or operator in an attempt to work out a solution, take his

complaint to arbitration or to court, or simply move his cattle to another feedlot. Generally, if the owner is dissatisfied with a feedlot, when he purchases his next set of cattle he will place those cattle with another feedlot. It is very unusual to move cattle from one feedlot to another during their feeding cycle, because it throws the cattle off feed and adds freight charges.

Commercial feedlots offer cattle owners marketing services. The feedlot will place fat cattle on a show list for viewing by packers/buyers who usually visit the feedlots daily. In many instances, the feedlot manager will negotiate a sale of cattle to the packer/buyer from the cattle owner.

A cattle owner must purchase feed for his cattle to consume during the feeding period. An owner can buy feed directly from a grain or feed mill, or he can buy feed through the feedlot. If the owner buys from a grain or feed mill, he can take physical possession of his prepurchased feed and store it either at his own expense or at an accommodating feedlot. Also, a cattle owner can simply rely on the feedlot to secure the amount of feed necessary to feed his cattle during the feeding period.

Dr. Wallace became interested in the cattle feeding program in 1979. Prior to his involvement in the cattle feeding program, he had no background in farming. After researching the program, he concluded that the cattle feeding business had a good profit potential. From 1980 until 1985, Dr. Wallace purchased cattle and placed them for feeding in a commercial feedlot.

In December 1980, Dr. Wallace retained the firm of Featheringill & Haynes to advise him in regard to his cattle feeding program. Dr. Wallace's agreement with Featheringill & Haynes provided for the number of cattle to be purchased, the feedlot where the cattle were to be placed, the hedging of the cattle, and the obtaining of disease insurance on the cattle. In August 1981, upon the breakup of the Featheringill & Haynes firm, Dr. Wallace retained the services of Mr. Haynes, working though the firm of Haynes Investment Services.

Both when he engaged the services of Featheringill & Haynes and when he engaged Haynes Investment Services, Dr. Wallace paid a flat fee of $10 per head of cattle for

advice. During the time that Dr. Wallace retained the services of Haynes Investment Services, he also reimbursed Mr. Haynes for out-of-pocket expenses. From December 1981 until February 1986 Mr. Haynes received the following amounts as compensation for his services rendered to Dr. Wallace:

| Date paid | Amount of fees |
|---|---|
| December 1981 | $13,450.00 |
| July 1982 | 18,573.00 |
| January 1983 | 9,659.00 |
| February 1984 | 36,800.00 |
| August 1984 | 32,959.00 |
| December 1984 | 9,351.90 |
| January 1985 | 33,600.00 |
| February 1986 | 47,320.00 |
| TOTAL | 201,712.90 |

As compensation for traveling expenses, Mr. Haynes received the following:

| Date paid | Amount of reimbursement |
|---|---|
| March 1984 | $272 |
| January 1985 | 626 |
| July 1985 | 824 |
| TOTAL | 1,722 |

Mr. Haynes received commissions from Saul Stone & Co. for commodity trades undertaken on behalf of Dr. Wallace. Dr. Wallace and Mrs. Wallace had discussed eventually terminating the relationship with Mr. Haynes when they believed they understood the cattle business well enough to make a profit without paying someone an advisory fee, but did not terminate the relationship before they discontinued their cattle activity in 1985. Petitioners planned to have an employee do the bookkeeping and visit the feedlots if they discontinued the services of Mr. Haynes.

Mr. Haynes would advise Dr. Wallace on hedging, feed purchasing, and selling cattle and would provide Dr. Wallace with an analysis of the cattle market as often as Dr. Wallace requested such advice. Mr. Haynes would discuss the advantages of different feedlots with Dr. Wallace and make recommendations. However, Dr. Wallace after receiving Mr. Haynes' advice made his own investment decisions.

The cattle owners that Mr. Haynes represented had varying degrees of risk they were willing to take. Mr. Haynes considered Dr. Wallace extremely motivated to make money and more willing to take risks than many of Mr. Haynes' clients. Even though it was highly unusual, Dr. Wallace on one occasion moved cattle from one feedlot to another during the feeding cycle when he became dissatisfied with the feedlot operator's performance. At one time, Dr. Wallace had expressed an interest in acquiring a feedlot to own and operate himself. He later decided that it was not a good idea and discontinued looking for a feedlot to purchase.

From 1980 until 1985, Mr. Haynes also owned feeder cattle. Most of the time, Mr. Haynes' clients used the same feedlot Mr. Haynes was using for his own cattle. Mr. Haynes would telephone the feedlot manager in regard to his and his clients' cattle as often as 3 or 4 times a week. He would generally telephone Dr. Wallace about once a week. Dr. Wallace would speak to the feedlot manager personally 2 or 3 times during a feeding cycle. Dr. Wallace visited the feedlots from 1980 until 1985 between 2 to 6 times. The visits usually lasted 1/2 to 1 day and were made while he was en route to another destination. Linda McDonald, Dr. Wallace's bookkeeper, visited the feedlots with Mr. Haynes once or twice.

Mr. Haynes would locate cattle for Dr. Wallace to buy. Neither Dr. Wallace nor Mr. Haynes had seen the cattle firsthand at the time they were purchased. Mr. Haynes was never given authority to draw on his clients' bank accounts or to draw on lines of credit they had arranged, but he would arrange with the client to have the seller paid by wire the same day. Mr. Haynes also assisted Dr. Wallace in locating a suitable feedlot to care for his cattle.

Considerable authority with respect to "sell" decisions was delegated by Dr. Wallace to Mr. Haynes because such decisions often had to be made almost immediately and Mr. Haynes was generally more accessible than Dr. Wallace. Mr. Haynes tried to confer with Dr. Wallace before making the decision. Any decision Mr. Haynes made regarding Dr. Wallace's cattle was made pursuant to Dr. Wallace's direction or ratification. There was at least one occasion

when Mr. Haynes specifically recommended that Dr. Wallace accept an opportunity to sell his cattle, but Dr. Wallace decided to wait. Dr. Wallace eventually sold the cattle at a better price.

Mr. Haynes maintained records regarding Dr. Wallace's investment in cattle. Mr. Haynes would prepare a profit and loss statement with respect to Dr. Wallace's cattle management at the end of each feed cycle. In addition, either Dr. Wallace, Mrs. Wallace, or an employee of Dr. Wallace, Linda McDonald, maintained a record of Dr. Wallace's cattle feeding operation in a general ledger.

Mr. Haynes offered advice to his clients with respect to hedging. Hedging is accomplished by selling fat cattle contracts through a commodities exchange, normally the Chicago Mercantile Exchange. Dr. Wallace always wanted to be hedged to the extent that projected losses would not exceed $200,000. Dr. Wallace, at the recommendation of Featheringill & Haynes, opened a commodities account with Saul Stone & Co. of Chicago, Illinois, to conduct hedging transactions on his behalf.

In order to leverage his cattle feeding investments, Dr. Wallace opted to borrow a substantial portion of the required investment from a production credit association. Production credit associations are rural banks established by the Federal Government to finance agricultural projects at competitive interest rates. Production credit associations normally will loan all but $105 to $115 of the cost of each purchased head of cattle in a cattle feeding program plus substantially all of the cost of feed and other costs. In each instance, Dr. Wallace would execute a Uniform Commercial Code security agreement in favor of the lending production credit association. As part of his loan agreement with each production credit association, Dr. Wallace was required to hedge a portion of his cattle if certain events took place. Saul Stone & Co. reported the hedging transactions to Dr. Wallace and to the respective production credit associations at least monthly.

The cost of the cattle purchased, together with the feed and hedging costs, would be paid by the lending production credit association and charged to Dr. Wallace's account. The production credit association would notify Dr. Wallace

of each feed purchase transaction in writing. Cattle sales and hedging profits were similarly paid to the respective production credit association and credited to Dr. Wallace's account. Any deficiency between the amount of the loan and the sales proceeds would be paid by Dr. Wallace to the production credit association at the end of the program year, and all profits would be paid or available to Dr. Wallace at the end of each program year.

During the years 1980 through 1985, Dr. Wallace purchased feed for cattle in large quantities and claimed a deduction in the year of purchase. However, Dr. Wallace's cattle did not consume all of the feed purchased during the year of purchase. The chart below shows the cost of feed purchased and the cost of feed consumed by the year of consumption:

| Year | Amount | Year consumed | | | | | |
| | | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|------|--------|------|------|------|------|------|------|
| 1980 | $473,320 | $7,355 | $465,965 | --- | --- | --- | --- |
| 1981 | 901,460 | --- | 661,445 | $240,016 | --- | --- | --- |
| 1982 | 526,568 | --- | --- | 125,968 | $400,600 | --- | --- |
| 1983 | 1,600,617 | --- | --- | --- | 81,026 | $1,519,591 | --- |
| 1984 | 1,865,222 | --- | --- | --- | --- | 890,222 | $975,000 |
| 1985 | 186,263 | --- | --- | --- | --- | --- | 186,263 |
| TOTALS | | 7,355 | 1,127,410 | 365,984 | 481,626 | 2,409,813 | 1,161,263 |

The following table summarizes Dr. Wallace's income and expenses for the years 1980-85 with regard to the cattle feeding operation:

| | 12/80-7/81 | 10/81-3/82 | 11/82-6/83 | 1983-84 | 1984-85 |
|---|---|---|---|---|---|
| *Income* | | | | | |
| Sales | $2,278,275 | $2,096,493 | $1,207,801 | $5,422,356 | $5,269,345 |
| Futures | 13,302 | 141,032 | (24,698) | (22,816) | 145,526 |
| Other | --- | --- | --- | --- | 914 |
| | 2,291,577 | 2,237,525 | 1,183,103 | 5,399,540 | 5,415,785 |
| *Expenses* | | | | | |
| Cattle | 1,468,098 | 1,280,892 | 669,009 | 3,306,109 | 3,322,080 |
| Feed | 809,696 | 644,229 | 435,021 | 1,858,281 | 1,670,419 |
| | 2,277,794 | 1,925,121 | 1,104,030 | 5,164,390 | 4,992,499 |
| GROSS PROFIT | 13,783 | 312,404 | 79,073 | 235,150 | 423,286 |
| *Other expenses* | | | | | |
| Interest | 114,954 | 109,971 | 94,360 | 181,948 | 188,280 |
| | --- | 44,865 | 26,895 | 70,031 | 90,898 |
| Other | 2,877 | 5,794 | 2,026 | 12,280 | 21,437 |
| | 117,831 | 160,630 | 123,281 | 264,259 | 300,615 |
| PROFIT (LOSS) | (104,048) | 151,774 | (44,208) | (29,109) | [1]125,671 |

[1]Incorrectly shown on exhibit as $122,671.

Dr. Wallace reinvested the profit from his sales of cattle in more cattle.

On their Federal income tax returns for the years 1980 through 1985, petitioners claimed as deductions the cattle feed they purchased, in the respective years of purchase as follows:

| Year | Amount deducted |
|------|-----------------|
| 1980 | $473,320 |
| 1981 | [1]901,460 |
| 1982 | [1]526,568 |
| 1983 | 1,600,617 |
| 1984 | 1,865,222 |
| 1985 | 186,263 |

[1]Petitioners actually deducted different amounts on their 1981 and 1982 returns. These figures reflect the amounts petitioners should have deducted as a deduction in year of purchase basis.

Respondent in his notice of deficiency disallowed $465,965 of the deduction for feed purchases claimed for the calendar year 1980 and $1,118,990 of the deduction for feed purchases claimed for the calendar year 1983 with the following explanation:

It is determined that your cattle operation was a farming syndicate and that you were a limited entrepreneur as defined by Section 464 of the Internal Revenue Code. Therefore, a deduction for amounts paid for feed is allowed only for the tax year in which it was actually consumed. * * *

*Facts Relating to Personal Service Income Issue*

Chunchula Fuel, Inc., an Alabama corporation, was incorporated on April 13, 1976. (Chunchula Fuel, Inc., in 1978 changed its name to Wallace Energy Corp. and in 1981 changed its name to Chunchula Energy Corp., but the entity will be referred to throughout this opinion as Chunchula or the corporation.) The purpose of the corporation was to purchase gas from one party and sell it to another. It adopted a fiscal year ending August 31. On September 1, 1976, it elected subchapter S corporation status under section 1362. Chunchula kept its books and filed its tax returns on an accrual basis of accounting.

The corporation issued a total of 100 shares of stock. Seventy shares of its $10 par value common capital stock were issued to Dr. Wallace, 5 shares to Mrs. Wallace, and 25 shares to Levoy Wallace, Dr. Wallace's brother. From

1976 until sometime in 1980, Mr. Levoy Wallace (Mr. Wallace) was president of Chunchula and from 1976 until Dr. Wallace's death, Mrs. Wallace was vice president and treasurer. Shortly after Dr. Wallace's death, Mrs. Wallace became president. Dr. Wallace, from 1976 until his death, was chairman of the board of directors of Chunchula and was elected president sometime in 1980.

One of the largest recent discoveries of natural gas in the southern region of the United States was the Big Escambia Creek Field in Escambia County, Alabama. Exxon Co., U.S.A. (Exxon), initiated production in the field in the early 1970s. Exxon's share of the production from the Escambia Creek Field exceeded its sales commitments and Exxon began looking for an additional purchaser to take the excess gas. At the time that Exxon was looking for a market for its excess production, Ciba-Geigy Corp. (Ciba) was looking for a secure supply of gas for its agricultural chemical plant in McIntosh, Alabama. Ciba wished to purchase only a portion of Exxon's excess production. Exxon, however, was unwilling to enter into a contract unless Ciba committed to take all of Exxon's uncommitted production from the Big Escambia Creek Field. Ciba agreed to Exxon's terms and purchased more gas than it could consume because it planned to sell the excess to a third company which was scheduled to build a chemical plant in south Alabama. Ciba contracted to purchase Exxon's excess production on a take-or-pay basis. The planned new chemical plant was never built, and Ciba was left with excess natural gas for which it had to pay. Ciba offered its excess gas to Mobile Gas. However, Mobile Gas could not buy gas from Ciba at that time because of a sole source contract which it had with United Gas Pipeline Co. (United Gas). The terms of the United Gas contract prohibited Mobile Gas from searching for or contracting to buy gas from any other supplier until United Gas notified Mobile Gas in writing that United Gas would not be able to supply gas. Prior to the years 1975-76, Mobile Gas had experienced no difficulty in procuring an adequate supply of natural gas.

Sometime during 1976, Dr. Wallace and Mr. Wallace learned about Ciba's excess gas and entered into negotiations for the purchase of natural gas from Ciba on behalf of

Chunchula. The meetings between Ciba and Dr. Wallace were held initially on a weekly basis and then on a daily basis. Sometimes the Ciba negotiations were conducted after Dr. Wallace had finished his hospital rounds and lasted until 1 or 2 a.m.

Chunchula contracted with Ciba to purchase Ciba's excess supply of natural gas. The contract was executed on May 19, 1976, to be effective in September 1976. Under the contract, Chunchula was required to take-or-pay for 5.0 MMBtu's of natural gas per day. The contract also contained two options to purchase additional increments. An MMBtu is a million British thermal units, a standard unit of heat or energy measurement. The contract between Ciba and Chunchula which was for a period of approximately 9 years expired by its terms on March 11, 1985.

Chunchula attempted to market the gas during the period between the execution of its contract with Ciba and the time it was required to start taking delivery of gas. During this period, United Gas notified Mobile Gas to find another source. Mobile Gas approached Ciba with respect to the purchase of gas, but was informed that Ciba had sold its excess gas to Chunchula. Ciba referred officials of Mobile Gas to Dr. Wallace and Mr. Wallace.

Mobile Gas and Chunchula entered into negotiations with respect to the purchase and sale of gas. Ciba participated in the negotiations at the request of Mobile Gas. Dr. Wallace and Mr. Wallace negotiated on behalf of Chunchula. Mr. Wallace arranged the times for and participated in the negotiations, but Dr. Wallace was the principal decision maker for Chunchula. Through Dr. Wallace's efforts, disagreements between the parties were resolved and the agreement consummated.

On September 15, 1976, a contract was signed between Mobile Gas and Chunchula. Mobile Gas took title to the natural gas at Ciba's McIntosh Plant and paid to transport the gas to its own lines. The price that Mobile Gas paid Chunchula was significantly higher than Mobile Gas had paid prior to that time or has paid since for natural gas. Mobile Gas paid Chunchula the same price that Chunchula was paying to Ciba plus a service charge, which produced the profit realized by Chunchula on the contract. Chunchula

was required to send Mobile Gas a statement of the volume of gas transmitted and the price thereof by the 22d day of each month, and Mobile Gas was required to pay for the gas by the 28th day of the month. The contract between Mobile Gas and Chunchula expired by its terms in March of 1985.

Ciba, Chunchula, and Mobile Gas entered into supplemental agreements which gave Mobile Gas the right to purchase gas directly from Ciba if Chunchula failed to perform its contract obligations with Ciba. The agreements also committed Ciba to perform its contract with Mobile Gas on the same terms as the contract between Mobile Gas and Chunchula.

On or about March 8, 1977, Chunchula executed a gas purchase contract with Conecuh-Monroe Counties Gas District, an Alabama corporation (Conecuh). Like the contract with Mobile Gas, the contract between Chunchula and Conecuh provided for a service charge in addition to the price Chunchula paid Ciba for the gas. The billing procedure under the contract between Chunchula and Conecuh required that Conecuh pay Chunchula within 4 days after it received a statement from Chunchula. This contract also expired by its terms in March of 1985.

Chunchula took title to the gas from Ciba at the outlet side of the Ciba plant in McIntosh, Alabama, which was the same point at which Chunchula conveyed title to its purchasers, Mobile Gas and Conecuh. Chunchula did not maintain an inventory of gas and did not transport the gas. The sale of gas was discontinued by Chunchula when its contracts with Mobile Gas and Conecuh expired in March of 1985.

Problems arose in the administration of the contract with Mobile Gas almost as soon as it was executed. The first dispute, in October of 1976, involved the question of whether Mobile Gas was entitled to a discount or entitlement in determining the purchase price. The parties were unable to amicably settle the issue. Litigation ensued in the Mobile County Circuit Court in 1978 and the dispute was resolved unfavorably to Chunchula in 1980. Dr. Wallace was one of the persons who decided whether to pursue the claim.

He appeared at the trial and kept track of the progress of the litigation.

Problems also arose between Conecuh and Chunchula in 1978, the first full year of the contract. Under the terms of the contract, Conecuh was invoiced for the amount of gas actually used rather than the amount required to be taken under the take-or-pay provision. At the end of the year an invoice was sent for the difference between the amount of gas required to be taken and the amount actually taken. Conecuh frequently took less than it was required to take, causing Chunchula to be short in the amount it was required to take from Ciba. Ciba would invoice Chunchula for the shortage and Chunchula would invoice Conecuh. Conecuh would invariably refuse to pay Chunchula for the shortage arguing insufficient gas pressure or force majeure, and Chunchula would refuse to pay Ciba. The dispute with Conecuh was resolved out of court by December 1978 after negotiations in which Dr. Wallace played a very significant role. Dr. Wallace was the person who was able to get the parties to reach an agreement.

In 1977 an associate of Dr. Wallace sued Chunchula alleging nonpayment of a sales commission. The case was ultimately settled on May 4, 1979.

In 1978 the natural gas policy act (NGPA) was enacted. NGPA regulated the "first sale" price of natural gas. Under NGPA, the question arose whether any or all of the Chunchula contracts with Ciba, Mobile Gas, and Conecuh involved "first sales" as defined under the act. The Federal Energy Regulatory Commission (FERC), the Federal agency charged with administration of NGPA, was requested by Mobile Gas to rule on the application of NGPA to the Chunchula contracts. When a ruling was not forthcoming within a period of 5 or 6 months, both Mobile Gas and Conecuh refused to pay more than the regulated "first sale" price to Chunchula. Ciba demanded the contract price, which was more than the regulated "first sale" price, from Chunchula. It became necessary for Chunchula to borrow money in order to make payments to Ciba. Dr. Wallace lent money to Chunchula. The balance sheets on Chunchula's Federal income tax returns for its fiscal years ending August 31, 1980, and August 31, 1981, show that at the

beginning of its 1980 fiscal year Chunchula had loans from shareholders of $240 and at the end of its 1980 fiscal year and the beginning and end of its 1981 fiscal year it had loans from shareholders of $219,000. Ultimately Chunchula stopped making full payments to Ciba. Ciba filed a lawsuit in the Circuit Court of Mobile County against Chunchula demanding payment in full. The case was litigated through the temporary injunction stage. The issues presented to the circuit court involved the jurisdiction of the FERC over the issue and the action needed to assure availability of funds from all purchasers pending an FERC ruling.

The circuit court, in its order dated December 8, 1980, enjoined the further distribution of profits, dividends, or salaries by Chunchula except an amount not greater than $3,000 per month to Dr. Wallace as compensation for services. No testimony was presented to the circuit court concerning the reasonable value of Dr. Wallace's services. The provision for a payment to Dr. Wallace of $3,000 per month was an agreement between the attorneys that would allow some payment by Chunchula to Dr. Wallace while maintaining the status quo of the various litigants. The court further ordered that Mobile Gas and Conecuh continue to pay the "first sale" price to Chunchula with the balance of the price required by the contract to be paid into the registry of the court.

Various legal problems were discussed between representatives of Chunchula and Chunchula's attorneys. The ultimate decision was that Chunchula would push its case before the FERC. Meetings were held over a 4 to 5 month period in Mobile, Alabama, New York, New York, and Washington, D.C., between representatives of Chunchula, Mobile Gas, and Conecuh. Since Dr. Wallace's finances were at stake in the dispute, he was present at most of the negotiating sessions and was involved in every facet of the discussions. Many offers were made to Chunchula and rejected by Dr. Wallace.

Chunchula retained Washington, D.C., counsel to represent its interest before the FERC. Eventually meetings were held in Washington, D.C., with staff from the FERC at which 20 or 30 different entities were represented. Finally, an agreement was reached among Chunchula, Ciba, Mobile

Gas, and Conecuh, restructuring the price to be paid by each party in the chain. The settlement was adopted by the FERC and incorporated in an order dated July 17, 1981. The ultimate result was favorable to Chunchula.

Chunchula paid no shareholder, other than Dr. Wallace and Mr. Wallace, any amount of money during the years 1976 through 1981. The corporation paid its corporate secretary, Linda McDonald, a salary during the fiscal years ending August 31, 1977, and August 31, 1978, of $7,545 and $9,875, respectively.

A clear division of duties existed in Chunchula between Dr. Wallace and Mr. Wallace. Mr. Wallace was responsible for the management of the daily operations of the company. Dr. Wallace, as chairman of the board of directors, was the final decision maker. Also, he was the person with the personal financial means to bring projects to completion. Dr. Wallace explored other business ventures on behalf of Chunchula which did not come to fruition.

Chunchula held a joint shareholders' and directors' meeting once a year. The 1980 meeting was held sometime around the end of the fiscal year ending August 31, 1980. Before the commencement of that particular meeting, Dr. Wallace had already decided the amount he and Mr. Wallace would receive as bonuses and the amount he would receive as a commission. The amounts were ratified at the meeting.

During its fiscal years ending August 31, 1977 through August 31, 1981, the corporation reported the following gross revenue and taxable income:

| Year ending | Gross revenue | Taxable income |
|---|---|---|
| 8/31/77 | $3,254,226 | $12,547 |
| 8/31/78 | 6,972,348 | 13,070 |
| 8/31/79 | 7,957,526 | 11,385 |
| 8/31/80 | 8,360,352 | 9,921 |
| 8/31/81 | 9,018,324 | 22,000 |

During its fiscal year ending August 31, 1980, Chunchula deducted $59,665 as accounting and legal fees and in its fiscal year ending August 31, 1981, deducted $90,134 as accounting and legal fees. During its fiscal years 1977 through 1981, the corporation paid Dr. Wallace and Mr. Wallace the following amounts:

| Year | Dr. Wallace | Mr. Wallace |
|---|---|---|
| 8/31/77 | $123,500 | $74,500 |
| 8/31/78 | 180,000 | 209,790 |
| 8/31/79 | 329,114 | 161,490 |
| 8/31/80 | 886,646 | 258,549 |
| 8/31/81 | 36,000 | - - - |

During its fiscal years 1976 through 1982, the corporation paid the following amounts as dividends to the stockholders of Chunchula:

| Year | Dr. and Mrs. Wallace | Mr. Wallace |
|---|---|---|
| 8/31/76 | - - - | - - - |
| 8/31/77 | - - - | - - - |
| 8/31/78 | - - - | - - - |
| 8/31/79 | - - - | - - - |
| 8/31/80 | $7,500 | $2,500 |
| 8/31/81 | 7,500 | 2,500 |
| 1/31/82 | 7,500 | 2,500 |

During its fiscal year ending August 31, 1980, Chunchula paid Dr. Wallace a monthly salary of $3,000. Sometime around the end of the year, Chunchula accrued a bonus to Dr. Wallace of $750,646 and a commission of $100,000, which amounts were paid to him by check issued November 14, 1980. Chunchula treated these payments as deductions in arriving at its net profit for its fiscal year 1980. On his joint income tax return for 1980, Dr. Wallace reported wages paid to him by Chunchula of $786,646.25 and commissions of $100,000 for a total of $886,646.25, which he reported as income from personal services.

Respondent in his notice of deficiency determined that Dr. Wallace had personal service income in 1980 of $87,458 giving the following explanation:

The tax rate schedules are used to compute your tax for 1980 because you do not qualify to use the maximum tax computation. It is determined that only $36,000 of the amount shown on your return as wages and commissions from Chunchula Energy Corporation qualifies as personal service income. It has not been established that any amount in excess of $36,000 you received from that corporation was compensation for personal services actually rendered. Your revised personal service income as shown in Schedule 4 is computed as follows:

Wages:
| | |
|---|---|
| H & W Pipeline Corporation | $14,800 |
| Chunchula Energy Corporation | 36,000 |
| Gerald L. Wallace, P.A. | 41,950 |

| | |
|---|---:|
| Farm Loss......................................... | (8,092) |
| Directors Fees .................................... | 2,800 |
| Commissions ...................................... | - - - |
| Total Personal Service Income ...................... | 87,458 |

## OPINION

### *Prepaid Feed Issue*

## Section 464(a) provides:

SEC. 464(a). GENERAL RULE.—In the case of any farming syndicate (as defined in subsection (c)), a deduction (otherwise allowable under this chapter) for amounts paid for feed * * * shall only be allowed for the taxable year in which such feed * * * [is] actually used or consumed, or, if later, in the taxable year for which allowable as a deduction (determined without regard to this section).

## A farming syndicate is defined in section 464(c)(1)(B) as:

(B) a partnership or any other enterprise other than a corporation which is not an S corporation engaged in the trade or business of farming, if more than 35 percent of the losses during any period are allocable to limited partners or limited entrepreneurs.

## A limited entrepreneur is defined in section 464(e)(2) as a person who:

(A) has an interest in an enterprise other than as a limited partner, and
(B) does not actively participate in the management of such enterprise.

The parties agree that Dr. Wallace was engaged in the trade or business of farming, that all losses of the cattle business (and therefore over 35 percent of the losses) were allocable to Dr. Wallace, and that the interest of Dr. Wallace in the cattle business was other than as a limited partner. The parties do not agree as to whether Dr. Wallace actively participated in the management of the cattle business. The parties agree that if Dr. Wallace actively participated in the cattle enterprise, he is not a limited entrepreneur and if he is not a limited entrepreneur, his cattle business is not a farming syndicate as defined in section 464. The parties also agree that if Dr. Wallace's cattle enterprise does not come within the definition of a farming syndicate, he is entitled to deduct the cost of all cattle feed purchased in the year of purchase. If that

enterprise is a farming syndicate under the provisions of section 464, he is only entitled to deduct the cost of the feed purchased in the year it is consumed.

Petitioners contend that Dr. Wallace actively participated in the management of the cattle feeding enterprise. Petitioners maintain that the relevant farming business is the trade or business of buying and selling cattle for a profit and not the trade or business of feeding cattle. Petitioners further argue that as an active participant in the management of the business, Dr. Wallace was not a limited entrepreneur and, therefore, that the limitation on deduction of feed expenditures provision is not applicable to him.

Petitioners submit that Dr. Wallace meets the material participation standard of section 469 (dealing with passive activity losses) and the active management and material participation standards of section 2032A (dealing with valuation for estate tax purposes of certain farm property). Petitioners also contend that they meet the material participation standard of section 1402 (dealing with self-employment income) and attempt to support the position that Dr. Wallace actively participated in the trade or business of buying and selling cattle by reference to categories under section 183 (dealing with activities not engaged in for profit).

Respondent contends that Dr. Wallace did not actively participate in the management of the cattle feeding enterprise. In support of this contention, respondent maintains that the relevant farming business is the cattle feeding business. Respondent argues that Dr. Wallace did not actively engage in the management of the cattle feeding business and, therefore, was a limited entrepreneur. On this basis, respondent contends that expenditures for cattle feed are deductible only in the year the cattle feed was consumed. Respondent argues that Dr. Wallace did not actively participate in the management of the feedlot; most of the decisions Dr. Wallace made with respect to the cattle feeding enterprise were made with the advice of a financial advisor, and Dr. Wallace's activities more closely resembled those of an investor than those of an active participant in the enterprise.

The interpretation of the term "active participation" as used in the definition of limited entrepreneur is an issue of first impression. We have found only one case decided under section 464. Although the opinion in that case discusses the active participation standard, because of the agreement of the parties this Court did not reach the issue of whether the taxpayers were limited entrepreneurs in that case. The issue before the Court was whether the taxpayers were members of a farming enterprise and, if so, whether more than 35 percent of the losses from the farming enterprise were "allocable" to them. *Hirasuna v. Commissioner,* 89 T.C. 1216 (1987).

There is some guidance in interpreting the meaning of active participation as used in section 464 in the legislative history of section 464. The legislative history of a statute is indicative of the intent of Congress in enacting the statute and therefore helpful to the Court in interpreting the statute. *Federal Power Commission v. Memphis Light, Gas, & Water Division,* 411 U.S. 458, 471-472 (1973); *First Chicago Corp. v. Commissioner,* 88 T.C. 663, 671 (1987), affd. 842 F.2d 180 (7th Cir. 1988); *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989); *J.C. Penney Co. v. Commissioner,* 37 T.C. 1013, 1019 (1962), affd. 312 F.2d 65 (2d Cir. 1962).

As a reason for adding section 464 to the Internal Revenue Code, the House and Senate reports both state:

Cattle feeding offers one of the best known and, until recent downturns in the farm economy, most widely used deferral shelters. Typically, the investment is organized as a limited partnership or as an agency relationship (under a management contract) in which a commercial feedlot or a promoter agrees to act as an agent for the investor in buying, feeding and managing cattle. After being fed a specialized diet for four to six months, the fattened cattle are sold at public auction to meat packers or food companies. A cattle feeding venture of this kind is typically formed in November or December, using leveraging and the cash method of accounting to permit taxpayers with income from other sources to defer taxes otherwise due on that income in that year by deducting expenses for prepaid feed, interest, and other costs incurred in the feeding venture. Income is realized in the following year when the fattened cattle are sold. At that time, the bank loans are repaid and any unpaid fees due the feedlot (or promoter) are deducted. The balance is distributed to the investors. Since feeder cattle are held for sale to customers, sales of the animals produce ordinary income. If the investors

were to reinvest their profit from one feeding cycle into another one, they could theoretically defer taxes indefinitely on the nonfarm income which they sheltered originally.

Since most investors in cattle feeding shelters buy in at the end of the calendar year, deductions for prepaid feed for the cattle have been central to the creation of tax losses in that year.

[S. Rept. 94-938, at 56 (1976), 1976-3 C.B. (Vol. 3) 94; H. Rept. 94-658, at 42 (1976), 1976-3 C.B. (Vol. 2) 734. Fn. ref. omitted.]

In identical language, both reports list factors for determining whether the active participation standard used in the definition of limited entrepreneur is met:

The determination whether a person actively participates in the operation or management of a farm depends upon the facts and circumstances. Factors which tend to indicate active participation include participation in the day-to-day decisions in the operation or management of the farm, actually working on the farm, living on the farm, and engaging in the hiring and discharging of employees as compared to only the farm manager. Factors which tend to indicate a passive person similar to a limited partner include lack of control of the management and operations of the farm, having authority only to discharge the farm manager, having a farm manager who is an independent contractor rather that an employee, not owning the farm land in fee, and having limited liability for farm losses. [S. Rept. 94-938, at 59 n. 12 (1976), 1976-3 C.B. (Vol. 3) 97; H. Rept. 94-658, at 47 n. 18 (1976), 1976-3 C.B. (Vol. 2) 73.]

The Proposed Income Tax Regulations at section 1.464-2(a)(3), 48 Fed. Reg. 51936, 51939 (Nov. 15, 1983), define limited entrepreneur:

For purposes of this section, the term "limited entrepreneur" means a person who has an interest in an enterprise other than as a limited partner and who does not actively participate in the management of such enterprise. The determination of whether a person actively participates in the management or operation of a farming enterprise depends on the facts and circumstances of each case. Factors which tend to indicate active participation include participating in the decisions involving the operation or management of the farm, actually working on the farm, living on the farm, or hiring and discharging employees (as compared to only the farm manager). Factors which tend to indicate a lack of active participation include lack of control of the management and operation of the farm, having authority only to discharge the farm manager, having a farm manager who is an independent contractor rather than an employee, and having limited liability for farm losses. For purposes of this paragraph, lack of fee ownership of the farm land shall not be a factor indicating a lack of active participation.

The provisions of the proposed regulations are in substance the same as the statements in the House and Senate reports except for the last sentence quoted above in the proposed regulations. Proposed regulations are not entitled to judicial deference and generally carry no more weight than a position advanced by respondent. *Estate of Howard v. Commissioner,* 91 T.C. 329, 337 (1988); *Laglia v. Commissioner,* 88 T.C. 894, 897 (1987); *F.W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1265-1266 (1970). However, where, as here, they closely follow the legislative history of the act, this Court has used such proposed regulations as guidelines.

The Joint Committee Explanation and the Proposed Income Tax Regulations, in substantially the same language, contain the following definition of limited liability:

> In determining whether a person has limited liability for farm losses, all the facts and circumstances are to be taken into account. Generally, for purposes of this definition, a person will be considered to have limited liability for farm losses if he is protected against loss to any significant degree by nonrecourse financing, stop-loss orders, guarantees, fixed price repurchase (or purchase) agreements, insurance, or other similar arrangements. A person with limited liability for farm losses might include, in appropriate circumstances * * * a principal who has given authority, in fact, to another party to conduct his operations (such as an investor who agrees to allow a feedlot to manage feeder cattle which he has purchased) and who utilizes nonrecourse financing, stop-loss orders[,] insurance, etc., to limit his risk.

Staff of the J. Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 47 n. 13, 1976-3 C.B. (Vol. 2) 59; see also sec. 1.464-2(a)(4), Proposed Income Tax Regs., 48 Fed. Reg. 51939-51940 (Nov. 15, 1983).

In order to determine whether Dr. Wallace satisfies the active participation criteria of the statute's legislative history, it is necessary to determine the type of farming business he conducted. Respondent contends that Dr. Wallace was in the business of feeding cattle. Petitioner contends that Dr. Wallace was in the trade or business of buying and selling cattle. Certainly Dr. Wallace bought cattle and sold them after they had been fed and fattened at a feedlot. The farming aspect of his operation was the feeding of the cattle. Had Dr. Wallace merely bought cattle

and resold them without any other activity with respect to the cattle, he would not have been in a farming business.

Dr. Wallace made the final decision as to the cattle he would purchase; when to purchase; what feedlot to use; whether to prepurchase feed; whether to "hedge"; what lending institution to use, if any; and when, and at what price, to sell the fattened cattle. These decisions are the type of decisions an investor makes. The feeding of the cattle at the feedlot is the farming operation. The facts here tend to show that Dr. Wallace had an investment in cattle, not that he was in the business of buying and selling cattle. His feeding of the cattle in which he invested was the farming business. Mr. Haynes, not Dr. Wallace, located the cattle to be purchased. Mr. Haynes would find suitable cattle and make a recommendation to Dr. Wallace with respect to their purchase. Neither Mr. Haynes nor Dr. Wallace saw the cattle before Dr. Wallace purchased them. When Dr. Wallace decided to buy a number of head of cattle, Mr. Haynes would arrange to have the seller paid by wire. Dr. Wallace paid Mr. Haynes a commission, $10 per head of cattle, to advise him with respect to the purchase, to hedging, and to the selling of cattle. Over the 5 years that Mr. Haynes was employed by Dr. Wallace his total commissions were $201,712. Dr. Wallace delegated considerable authority with respect to "sell" decisions to Mr. Haynes. Dr. Wallace's only decision with respect to the sale of cattle was whether the price offered was favorable. The feedlot manager determined the limited time period, generally 2 weeks, within which the cattle must be sold for slaughter. Offers to purchase the cattle were made by a packing plant through the feedlot.

On the basis of the record in this case, we conclude that the business Dr. Wallace was engaged in was cattle feeding. His purchase of cattle and sale of the cattle after they were fed was incidental to his cattle feeding business. When Mrs. Wallace was questioned about the cattle operation, she referred to it as a cattle feeding business. She testified that in 1979 she prepared a folder containing information on cattle feeding. She also testified that Dr. Wallace told her he felt that he could make money in feeding cattle. Mrs. Wallace described the steps she considered necessary to

engage in a cattle feeding business. She explained the steps Dr. Wallace took to become involved in the cattle feeding business: contacting Mr. Haynes; buying a number of head of cattle; and arranging financing. From Mrs. Wallace's testimony, it is clear that Dr. Wallace considered himself to be engaged in the cattle feeding business and not in the business of buying and selling cattle. Furthermore, a videotape entitled "The Finishing Touch" that was played at trial and introduced into evidence by petitioners refers to the precise activity that Dr. Wallace was engaged in as the "cattle feeding industry," not the cattle buying and selling industry.

We find that Dr. Wallace was in the cattle feeding business during the years here in issue. It is clear that Dr. Wallace did not actively participate in the management of the feedlot where his cattle were fed within the meaning of that term as used in section 464(e)(2) or as explained in the Senate and House reports.

Dr. Wallace did not, and in fact could not, participate in the decisions involving the operation or management of the feedlot. The decisions available to Dr. Wallace with respect to the feedlot were the selection of the feedlot to which to send his cattle, whether to buy the feed from the feedlot or from someone else, and when to sell the cattle. He did not decide what mix of grain to feed his cattle; he did not make decisions regarding the health of the cattle; he did not make decisions that arose out of the daily monitoring and checking of the cattle or decisions as to the care to be given to sick, lame, or injured cattle; he did not make decisions regarding when to feed his cattle or how much to feed his cattle or whether to give them feed supplements; he did not monitor the cattle's weight. Dr. Wallace generally could not obtain treatment for his cattle different from the treatment of all other cattle in the feedlot. Once Dr. Wallace's cattle were put into a feedlot, they were treated the same as all the other cattle in the feedlot which were at the same stage of development.

If Dr. Wallace were dissatisfied with the feedlot, he could try to convince the feedlot manager to make adjustments, take the matter before an arbitration panel, litigate the dispute, or move his cattle to another feedlot. He could not

force the manager of the feedlot to alter his operation or management decisions.

Dr. Wallace did not actively participate in the management of the feedlot by actually working or living at the feedlot. He did not actively participate in the operation or management of the feedlot by hiring or discharging employees of the feedlot.

Dr. Wallace had no right to supervise the manager's work and the number of hours he worked, or to control the details and manner of his performance. Dr. Wallace could not have the manager removed from his position as manager of the feedlot. He could only move his cattle from a particular feedlot and not use the services of that feedlot in the future. The feedlot manager's relationship to Dr. Wallace was that of an independent contractor. See *O'Brien v. Commissioner*, 79 T.C. 776, 781-782 (1982).

Dr. Wallace had limited liability for losses with respect to his cattle feeding operation as defined in the proposed income tax regulations. Dr. Wallace agreed to allow the feedlot to manage feeder cattle which he purchased. He was protected from losses to a significant degree by the use of hedging and in 1980, his cattle were 100 percent hedged. In some subsequent years Dr. Wallace's cattle were 100 percent hedged. He was protected from loss of his cattle by disease insurance. See sec. 1.464-2(a)(4)(ii)(B), Proposed Income Tax Regs., *supra*.

Dr. Wallace paid a service charge to the feedlots at which he kept his cattle. The service charge was either included in a markup on the feed or was based on a daily "yardage fee." The fee was for the services that were provided his cattle. The fee was compensation to those who were in fact feeding, managing, and marketing the cattle Dr. Wallace had at the feedlot.

Dr. Wallace did not have the level of participation in the cattle feeding business required to be considered an active participant in that business. On the basis of the facts in this record we conclude that Dr. Wallace did not actively participate in the trade or business of cattle feeding.

We do not agree with petitioners' contention that the interpretation of "active management" as used in section 2032A (special use valuation) should be applied to the

determination of active participation as used in section 464. The special use valuation rules are intended to encourage and facilitate the use of real property for farming and other small business purposes by reducing the threat of a forced sale of the property to pay the estate tax. H. Rept. 94-1380, at 3, 21-22 (1976), 1976-3 C.B. (Vol. 3) 739, 755-756. See also *Martin v. Commissioner,* 84 T.C. 620, 625-626 (1985), affd. 783 F.2d 81, 84 (7th Cir. 1986). "Active management" is defined in section 2032A(e)(12). Section 464 was enacted to permit only farmers who are actively engaged in farm operations to take advantage of the special tax rules afforded farmers. Looking at the legislative history of both sections, there is no indication that Congress intended the terms "active participation" and "active management" to have the same meaning.

Similarly, the definition of "active participation" found in section 469(i)(6) is distinct from that found in section 464. Section 469 was designed to limit deductions for a loss from a passive activity. The section provides a definition of both material participation and active participation. Active participation is defined specifically in reference to rental real estate activities. Certainly a definition for purposes of rental real estate activities is not applicable to farming activities.

Petitioners' discussion of section 183 in an attempt to establish that Dr. Wallace was engaged in the trade or business of buying and selling cattle does not address the issue here involved. Section 183 deals with the limitation of deductions with respect to an activity not engaged in for profit. Respondent does not contend that Dr. Wallace was not engaged in the trade or business of farming. Respondent recognizes that Dr. Wallace is entitled to deduct feed expenses as a farmer, but contends the deduction is subject to the limitations of section 464. Whether Dr. Wallace may deduct feed expenses is not in issue; the issue is *when* he is allowed the deduction for these expenses. Factors used to determine whether an activity is engaged in for profit do not aid in making this determination.

We hold that Dr. Wallace was a limited entrepreneur within the meaning of section 464. Since Dr. Wallace was a limited entrepreneur, his cattle feed business meets the definition of farming syndicate and the deduction limita-

tions for feed expenditures of section 464 are applicable. Accordingly, Dr. Wallace is entitled to deduct only the expenditures for feed that was actually consumed during the taxable year to which the deduction applies.

### Characterization of Income Issue

Section 1348 as applicable to the calendar year 1980 provided for a maximum tax of 50 percent on personal service income. Personal service income was defined as "any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) or which is an amount received as a pension or annuity which arises from an employer-employee relationship." Sec. 1348(b)(1)(A).

Section 911(b) incorporated into section 1348 defines earned income in the following manner:

wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * *

Section 162(a)(1) provides that, in computing its taxable income, a corporation shall be allowed as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." This Court has held that compensation which qualifies as "a reasonable allowance * * * for personal services actually rendered" under section 162(a)(1) qualifies as earned income for purposes of section 1348; conversely, compensation which is unreasonable under section 162(a)(1) does not so qualify. *Kennedy v. Commissioner*, 72 T.C. 793, 806 (1979), reversed as to amount of reasonable compensation 671 F.2d 167 (6th Cir. 1982). Therefore the case law defining "reasonable compensation" under section 162(a)(1) is controlling for purposes of this case.

Petitioners contend that the entire $886,646 paid to Dr. Wallace by Chunchula was properly classified as earned income since this entire amount was paid for services rendered. Respondent contends that only $36,000 of the

amount that Dr. Wallace received from Chunchula in 1980 was earned income, and the remainder was a dividend. Therefore, respondent computed Dr. Wallace's earned income from Chunchula, taxable at a maximum rate of 50 percent, to be $36,000.

The reasonableness of compensation is a question of fact to be determined from the record in each case. *Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975).

Dr. Wallace was the chief executive officer and principal decision maker of Chunchula. He was also the organizer of the corporation and his business expertise was to a large extent responsible for the financial success of Chunchula. These are certainly factors to be considered in determining the amount of reasonable compensation for his services to Chunchula.

In determining the compensation, among the factors to be considered are:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the [corporation] as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [*Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949).]

All the facts must be considered; no one factor is determinative. *Pacific Grains, Inc. v. Commissioner*, 399 F.2d 603, 606 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142, 1156 (1980).

Petitioners contend that part of Dr. Wallace's payment in 1980 was for services rendered in prior years. In fact they state that they "do not contend that the compensation paid to Dr. Wallace was solely for services rendered in 1980." Under some circumstances prior services may be compensated for in a later year. *Lucas v. Ox Fibre Brush Co.*, 281 U.S. 115 (1930). However, it is incumbent on a taxpayer

claiming that part of the payment to an officer in the current year is for services rendered for prior periods to show that the officer was not sufficiently compensated in the prior year and that in fact the current year's compensation was to compensate for that underpayment. *Pacific Grains, Inc. v. Commissioner, supra* at 606. There is no evidence in this record to show that Dr. Wallace was not paid in full for the services he rendered to Chunchula in 1979 and all other prior years. The record shows that he was paid $329,114 in 1979, and there is no evidence that this was not totally adequate for the services he rendered in that year. The record does show that Chunchula was selling gas in 1980 under contracts negotiated primarily by Dr. Wallace in prior years. While Dr. Wallace might be entitled to compensation in the nature of commissions on the 1980 sales because of having negotiated these contracts, this is because the "commissions" would relate to the 1980 sales and not because he was not adequately compensated in a prior year.

Dr. Wallace was chairman of the board of directors of Chunchula from its inception and sometime prior to August 31, 1980, was elected its president. By 1980, the contracts between Chunchula and Mobile Gas, Conecuh, and Ciba, each had been in effect for at least 3 years.

This record shows that the primary service that Dr. Wallace rendered to Chunchula during 1980 was negotiation. The record shows that Dr. Wallace had the ability to work out arrangements between two disagreeing parties. Dr. Wallace had served Chunchula in this capacity in prior years in a number of disputes. However, the only dispute in which Chunchula was involved in 1980 was the definition of "first sale." The record shows that Dr. Wallace, along with lawyers engaged by Chunchula in Washington, D.C., and Mobile, Alabama, attended a number of meetings with the various parties involved in the "first sale" definition dispute over a period of 3 to 5 months. However, there is no evidence to show the number of these meetings or the total amount of time Dr. Wallace spent at these meetings on behalf of Chunchula during 1980.

Dr. Wallace was not a full-time employee of Chunchula. In addition to his services to Chunchula, Dr. Wallace was

actively involved in a number of other business pursuits and maintained a medical practice. The indication from the record is that Dr. Wallace did not spend time on work for Chunchula on a regular basis. The day-to-day work was done by his brother, Mr. Wallace, and by the corporate secretary, Linda McDonald. Dr. Wallace was a part-time officer-employee. A part-time officer having exceptional ability, wide contacts, and a reputation for financial responsibility may be worth more to a corporation than a full-time officer lacking those qualities. See *Smoky Mountains Beverage Co. v. Commissioner,* 22 T.C. 1249, 1254 (1954). However, such a well qualified part-time employee is entitled to compensation as such and not as a full-time employee.

### *Prevailing Economic Conditions and Nature of Chunchula's Business*

In the mid-1970s there was a shortage of gas in the area served by Chunchula and a large demand for a reliable source of supply of natural gas. This environment was very favorable for Chunchula's business.

Chunchula was the middleman between a party wanting to sell and a party wanting to buy gas. Chunchula did not transport, store, or provide any services with respect to the gas. Due to the nature of its business, its day-to-day functions required principally administrative work. Mr. Wallace and Ms. McDonald performed the work required to administer the three contracts Chunchula had, such as collection and billing.

### *Comparison of Salaries*

The record shows that the compensation paid by the corporation to Dr. Wallace in 1980 constituted 10.6 percent of gross revenue and 75 percent of taxable income before deduction of salaries. The compensation paid by the corporation to both Dr. Wallace and Mr. Wallace in 1980 constituted 99 percent of taxable income before deduction of their salaries. That percentage indicates that the corporation was in part disguising the distribution of dividends as compensation. *Owensby & Kritikos, Inc. v. Commissioner,*

819 F.2d 1315, 1325-1326 (5th Cir. 1987), affg. a Memorandum Opinion of this Court.

The facts in this record show that from its inception Chunchula each year distributed nearly all of its income before deduction of salaries as compensation to Dr. Wallace and Mr. Wallace.

The compensation paid to Dr. Wallace increased from $123,500 in 1977 to $886,646 in 1980. There is no indication that there was any substantial increase in the nature, scope, or extent of work required of Dr. Wallace during this period. In the year at issue and in all the prior years, the corporation was involved in legal battles. However, there is no indication that the negotiating services required of Dr. Wallace increased from 1977 until 1980 and some indication that the services rendered by Dr. Wallace to Chunchula in prior years might have been greater than in 1980.

Clearly any agreement between Dr. Wallace and Chunchula as to Dr. Wallace's compensation was not at arm's length. Dr. Wallace controlled the corporation through his 70-percent ownership of stock. He was chairman of the board of directors and was elected president sometime in 1980. The record shows that Dr. Wallace made the decisions for Chunchula. Whether amounts paid by a corporation to an employee who is in control of the corporation are for services rendered must be given careful scrutiny. *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 805 (5th Cir. 1975); *Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142, 1156 (1980).

The only evidence of how Dr. Wallace's compensation was determined was that he intended to pay out nearly all the earnings of Chunchula as compensation to himself and his brother, Mr. Wallace. From 1977 until 1980, at least 94 percent of Chunchula's gross income before salaries to shareholders were deducted was paid out as compensation. The evidence indicates that the amount of bonuses was determined at the end of the year, after the earnings of the corporation for the year were known. The fact that nearly all the profits were paid out as compensation is indicative of

dividends being disguised as salary. The Fifth Circuit Court of Appeals has held that:

substantial bonuses declared at year-end when the earnings of a business are known usually indicate the existence of disguised dividends. This is even more true when, as here, the corporation has a history of distributing as compensation to its shareholder-employees the bulk of its profits. [*Owensby & Kritikos, Inc. v. Commissioner, supra* at 1329. Fn. refs. omitted.]

No evidence was introduced as to salaries paid by comparable companies to their officers or as to the income of comparable companies or dividends paid by comparable companies.

Petitioners offered the testimony of an expert witness. This witness testified that Dr. Wallace's role with Chunchula was analogous to that of a broker. Dr. Wallace obtained the contracts for the corporation and then administered the contracts. The obtaining and administering of the contracts was seen by this witness as a package deal with Dr. Wallace's compensation in later years arising from the fact that he had brought the contracts to the corporation in the first 2 years of the corporation's existence. The expert testified that, because of this fact, whatever compensation was paid to Dr. Wallace was reasonable. He referred to Dr. Wallace as "an entrepreneur." He concluded that since Chunchula was a subchapter S corporation with all its income being income to its stockholders, the stockholders were justified in considering all the corporate income as compensation.

We do not agree with these conclusions of petitioners' expert witness. The record before us does not support his conclusions and his opinion in substance amounts to a conclusion of law with which we do not agree. See *Tripp v. Commissioner,* 337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court.

An entrepreneur is not entitled to the profits of a corporation as compensation for services simply because he is an entrepreneur. Dr. Wallace chose to operate Chunchula as a subchapter S corporation. When a salary is paid from a corporation to an employee it should be based on the value of the services rendered, not on the right of the recipient as a stockholder to the corporate profits. Sec. 162(a)(1). The

salary of Dr. Wallace in 1980 should reflect reasonable compensation for the services he provided to Chunchula during that year. Section 1.162-7(b)(1), Income Tax Regs., provides:

Any amount paid in the form of compensation, but not in fact as the purchase price of services is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * *

A situation similar to that before the Court was presented in *Owensby & Kritikos, Inc. v. Commissioner, supra.* In that case, the income of three closely held corporations was derived from services such as consulting, drafting, and visual and nondestructive testing of drilling and production facilities; capital was not a material income-producing factor. During the years at issue, no dividends were paid to the shareholders. In sustaining the decision of this Court that reasonable compensation for two shareholder-employees of the corporation was less than claimed by the taxpayer, the Fifth Circuit Court of Appeals stated:

The trial court found and the Commissioner concedes that Mr. Owensby and Mr. Kritikos are both highly motivated, uniquely skilled, and extremely productive individuals. Moreover, O & K, PME, and TEST are highly specialized companies performing a multitude of professional services within a complex industry. Mr. Owensby and Mr. Kritikos fill a variety of roles within these companies, acting as managers, salesmen, technicians, innovators, and public relations agents. There is no question that the remarkable growth and profitability of O & K, PME, and TEST can be traced directly to Mr. Owensby and Mr. Kritikos. The Commissioner also concedes that capital was not a material income-producing factor for any of the corporations and that, although the economic climate was favorable during the years at issue, the success of the corporations was due mainly to the efforts of Mr. Owensby and Mr. Kritikos. These factors point to the conclusion that Mr. Owensby and Mr. Kritikos should be compensated handsomely for their services. Nonetheless, limits to reasonable compensation exist even for the most valuable employees. [*Owensby & Kritikos, Inc. v. Commissioner, supra* at 1325. Fn. ref. omitted.]

Just as in *Owensby & Kritikos, Inc.,* even though Dr. Wallace's services were very valuable to Chunchula, his compensation must still be reasonable in amount.

### Comparison of Salaries With Distributions to Stockholders

Even though Chunchula was very successful, only minimal dividends were paid. No dividends were paid prior to Chunchula's fiscal year 1980. An absence of profits paid back to the shareholders as dividends justifies an inference that some of the purported compensation really represents a distribution of profits. *Charles Schneider & Co. v. Commissioner, supra; Jones Bros. Bakery, Inc. v. United States,* 188 Ct. Cl. 226, 411 F.2d 1282, 1293 (1969). Petitioner argues that the dividends paid by Chunchula were "handsome" compared to the $1,000 equity invested in the company. In a case of minimal equity invested as here, this argument has no merit. Particularly is this true since there were large stockholder loans to the corporation and no showing of the nature of these loans.

It is not a legal requirement that a corporation pay dividends because shareholders are often content with the appreciation in the value of their stock that arises through retention of earnings. *Owensby & Kritikos, Inc. v. Commissioner, supra* at 1326; *Shaffstall Corp. v. United States,* 639 F. Supp. 1041, 1049 (S.D. Ind. 1986). However, here the corporation retained only minimal earnings.

Although there is no evidence in this record showing salaries paid by companies comparable to Chunchula to officers, we conclude that the evidence is sufficient to show that Dr. Wallace's services to the corporation in 1980 were worth more than the $36,000 determined by respondent as a reasonable salary considering the services rendered by Dr. Wallace to Chunchula. We conclude that reasonable compensation for Dr. Wallace's services as a negotiator for Chunchula in 1980 would be in the range of $100,000. In its fiscal year 1980, the corporation paid its lawyers and accountants $59,665 and in 1981 paid its lawyers and accountants $90,134. This record indicates that most of this was paid for negotiations with respect to the "first sale" price in which Dr. Wallace participated. We conclude that reasonable compensation for Dr. Wallace would include

some payment in the nature of a commission on sales of gas in 1980 under contracts he had negotiated in prior years. Chunchula placed this commission amount at $100,000. Finally, Dr. Wallace is entitled to compensation for his services as a director and chief executive officer of Chunchula. Considering all these factors, we conclude that reasonable compensation to Dr. Wallace in 1980 for services rendered to Chunchula is $250,000. This amount represents Dr. Wallace's personal service or earned income from Chunchula in 1980 subject to the limitation of section 1348 and the remaining payments to Dr. Wallace from Chunchula in 1980 are dividends.

*Decision will be entered under Rule 155.*