T.C. Memo. 1998-343

UNITED STATES TAX COURT

LABELGRAPHICS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13673-95.                    Filed September 28, 1998.

Gersham Goldstein, Gregory R. Mowe, Jaime M.W. Sanders, and

Peter R. Jarvis, for petitioner.

Shirley M. Francis, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent, in a notice of deficiency,

determined against petitioner the following Federal income tax

deficiencies, an addition to tax, and a penalty:

| Year Ended | Deficiency | Addition to Tax Sec. 6661 | Penalty Sec. 6662 |
|---|---|---|---|
| 6/30/87 | $48,610 | $12,153 | -- |
| 6/30/90 | 210,354 | -- | $42,071 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions,[1] the issues for decision are:

(1) The amount petitioner is entitled to deduct under section 162 as reasonable compensation to its president Lon Martin for its year ended June 30, 1990.  We find it is entitled to deduct $406,000.

(2) Whether petitioner is liable for an accuracy-related penalty under section 6662(a) and (b)(2) for the year ended June 30, 1990, with respect to its claimed deduction for the compensation to Lon Martin.  We hold that it is not liable for the penalty.

                    FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91 and are found accordingly.  We incorporate the parties' stipulations in this opinion by reference.

Petitioner is an Oregon corporation.  When its petition herein was filed, petitioner maintained its principal office in Portland, Oregon.

---

[1]Among other things, respondent concedes that petitioner is not liable for an addition to tax under sec. 6661 for its year ended June 30, 1987.

Petitioner manufactures pressure-sensitive identification materials, such as product labels and graphic overlays. In addition, it offers typesetting services to retail customers.

Lon Martin (who was petitioner's president and sole shareholder during its fiscal year ended June 30, 1990) completed about 2 years of college and then began working in the printing business. As of 1978, Mr. Martin had approximately 20 years of experience working in the label and printing industry. During those 20 years, he performed tasks ranging from running presses to managing his own label and printing business.

Before 1978, Mr. Martin, in partnership with other individuals, had owned and operated for a number of years a label and printing business in southern California. Following his first wife's death and his remarriage, he sold his interest in the southern California business and moved to Portland, Oregon, about 1978.

From 1978 until petitioner's incorporation in 1980, Mr. Martin operated a sole proprietorship label and printing business in Portland. Initially, this label and printing business was a one-man operation that he conducted with the help of his second wife and his junior-high-school-age son, Mike Martin (Mike). Mr. Martin called upon potential customers during the day and often printed at night the labels that were ordered. Mrs. Martin helped him by serving as a secretary and shipping clerk; Mike helped him with the printing of the labels.

In June 1980, petitioner was incorporated to conduct the sole proprietorship label and printing business that Mr. Martin had operated. Upon petitioner's incorporation, 450 shares of petitioner's outstanding shares of stock were issued to Mr. Martin and the remaining 50 shares of petitioner's outstanding stock were issued to another individual. In January 1986, this other individual's 50 shares were redeemed, and Mr. Martin became petitioner's sole shareholder. Mr. Martin continued to be petitioner's sole shareholder until 1992, when he sold all of his shares in petitioner to Mike. During its fiscal year ended June 30, 1990, petitioner's board of directors consisted of Mr. Martin, Mrs. Martin (Mr. Martin's wife), and Jerry Crispe (who was then petitioner's executive vice president).

In conducting his and later petitioner's label and printing business, Mr. Martin concentrated on selling to companies in the electronics industry, a number of which are located in the Pacific Northwest. Since its incorporation in 1980, all of petitioner's products have been custom designed and produced for particular customers. Most of petitioner's sales are to electronics companies, like Compaq and Hewlett-Packard, who demand high quality products from their suppliers.

Over the years, Mr. Martin has been extremely successful in operating petitioner profitably and in expanding its business and sales. Petitioner has enjoyed high profit margins in selling its custom-designed products to a number of high-technology

companies. Petitioner mastered early the ability to produce polycarbonate overlays with little loss of material. It has also been very innovative in developing scratch-resistant coatings for its products. By its fiscal year ended June 30, 1990, petitioner employed 58 persons. Its plant is perhaps one of the most modern in the United States. In addition, petitioner is very highly regarded in the label and printing industry. Its principal competitors in the country are much larger companies.

Over its first 8 fiscal years from July 1, 1980, through June 30, 1988, petitioner's annual gross receipts increased dramatically. Its gross receipts for each fiscal year during this period were higher than the preceding year. For its fiscal year ended June 30, 1988, petitioner had $4,821,650 in gross receipts.

Over its next 2 fiscal years from July 1, 1988, through June 30, 1990, however, petitioner's annual gross receipts slightly declined. This decline in petitioner's business was not unexpected. Earlier, in 1987, petitioner's management had anticipated such a possible future decline in business. At that time, its management recognized that it would be difficult to expand sales further in the Portland market and to maintain high profit margins, as petitioner had already saturated that market and was likely to encounter increasing competition for that market's remaining new business. Also, by 1987, petitioner's management was concerned about some customers' relocating their

manufacturing facilities to Puerto Rico, as management believed this relocation overseas might cause a reduction in petitioner's sales.

Around 1987 or 1988, Intel Corp. (a customer of petitioner that had recently relocated certain of its manufacturing facilities to Puerto Rico) asked whether Mr. Martin could establish a plant in Puerto Rico to supply its Puerto Rican facilities. As a result, during 1988, Mr. Martin incorporated LaserGraphics Caribe, Inc. (Caribe), to conduct a label and printing business in Puerto Rico.

Mr. Martin was Caribe's sole shareholder. Petitioner had no interest in Caribe, as the latter corporation was a personal business venture of Mr. Martin that was totally separate and distinct from petitioner.

From 1988 through 1990, Mr. Martin devoted some of his time to Caribe's business operations. Caribe established a plant in Puerto Rico. Mr. Martin operated Caribe for about 2 years, then sold the business after concluding that he could not operate it profitably.

During 1989 and 1990, petitioner successfully developed its Micro Clean 100 proprietary process for producing labels meeting the "clean room" production facility standards of its electronics industry customers. The process represented a significant technological innovation in the label industry. Before its development, there were no contaminant-free labels comparable to

petitioner's clean room labels. Although electronics companies could use normal labels to identify and package sensitive electronic components they manufactured in their clean rooms, the normal labels themselves would contain contaminants.

The materials used in and the processing for petitioner's clean room labels are quite different from that of normal labels. Clean room label production requires a special cleaning machine that petitioner devised to clean labels after their manufacture and before their packaging. In addition, the labels employ a special adhesive that petitioner developed with the assistance of outside adhesive consultants and chemists.

Mr. Martin was instrumental in developing the Micro Clean 100 process. In 1989, it was he who envisioned a process to produce labels to clean room standards, initiated the engineering program for its development, and saw the program through to a successful conclusion in early 1990. He and petitioner's staff engineer worked on the label-cleaning machine petitioner devised. He and certain other of petitioner's employees refined the process for producing clean room labels and worked with outside consultants and chemists to develop the special adhesive the labels required.

Petitioner sold its first clean room labels during the first half of 1990. For its fiscal year ended June 30, 1990, its sales of clean room labels totaled $32,639. In June 1990, petitioner's directors anticipated that clean room labels would produce

significant sales and profits in future years and would strengthen petitioner's competitive advantage in the industry. Their assumption proved to be correct, as by 1995 the labels accounted for approximately 30 percent of petitioner's sales and were the fastest growing and most profitable segment of its business.

From 1990 through 1996, petitioner's annual sales and gross margins from clean room labels were as follows:

| Year | Sales | Gross Margin |
|------|-------|--------------|
| 1990 | $174,099 | $102,196 |
| 1991 | 331,601 | 255,333 |
| 1992 | 450,856 | 360,685 |
| 1993 | 1,398,683 | 1,049,012 |
| 1994 | 1,828,637 | 1,371,478 |
| 1995 | 3,954,393 | 2,965,794 |
| 1996 | 5,116,026 | 3,990,500 |

During its fiscal year ended June 30, 1990, petitioner's three officers were Mr. Martin, president; Jerry Crispe, executive vice president; and Mrs. Martin, secretary. Of petitioner's officers, only Mr. Martin had substantial experience in the label and printing industry before working for petitioner. He designed petitioner's physical plant and layout. He also hired and trained the other members of petitioner's management team, including Mr. Crispe and Mike.

When he began working part time for petitioner around 1982 or 1983, Mr. Crispe had no experience in the label and printing business. He previously had been in the real estate development business and had some familiarity with general business matters.

He became a full-time employee in 1985.

After he began working full time for petitioner, Mr. Crispe eventually performed substantial administrative and general business tasks that Mr. Martin previously handled.

As indicated previously, Mike had helped Mr. Martin while in junior high school. Following his graduation from high school, he worked for petitioner full time. He became petitioner's production manager in the late 1980's and was promoted to vice president for manufacturing in 1990.

In addition to Mike, during its fiscal year ended June 30, 1990, petitioner employed a staff engineer, as well as two production managers or team leaders. Petitioner also had four salesmen, each of whom worked on a commission basis.

During 1990, Mr. Martin's duties included: (1) Setting corporate policy; (2) establishing and monitoring quality policy and authorizing resources to ensure compliance; (3) maintaining relationships with customers, professionals, and the community, as needed; (4) directing the investment of funds; (5) directing employee policies; (6) establishing 1-year and 5-year mission statements; (7) coordinating relationships with competitors, suppliers, and consultants to accomplish corporate goals; (8) chairing all board meetings; (9) approving departmental strategy; and (10) reviewing and approving all capital expenditures.

From 1981 through 1991, Mr. Martin's total annual compensation, consisting of a salary and bonus, from petitioner

was as follows:

| Year | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| 1981 | [1] | [1] | $27,750 |
| 1982 | [1] | [1] | 164,000 |
| 1983 | [1] | [1] | 162,900 |
| 1984 | [1] | [1] | 352,200 |
| 1985 | $154,000 | $150,000 | 304,000 |
| 1986 | 156,600 | 125,000 | 281,600 |
| 1987 | 156,600 | 125,000 | 281,600 |
| 1988 | 185,000 | 250,000 | 435,000 |
| 1989 | 158,200 | 200,000 | 358,200 |
| 1990 | 156,000 | 722,913 | 878,913 |
| 1991 | 156,000 | -- | 156,000 |

[1]No breakdown between salary and bonus is available.

Petitioner had no fixed formula for determining Mr. Martin's annual bonuses. Rather, its directors generally considered petitioner's financial performance for the recent fiscal year. For instance, concerning the $250,000 bonus paid to him for 1988, minutes of petitioner's board of directors' meeting on June 17, 1988, state, in pertinent part:

> 4. Bonus to Lon D. Martin. The directors reported that the past fiscal year had been particularly successful and that it was appropriate to raise Mr. Martin's annual bonus in light of such success. Additionally, Mr. Martin's regular base salary has not been increased for several years on the theory that his total annual compensation would be tied significantly to the performance of the corporation. In light of all of the above circumstances, the directors ratified and approved a bonus to Mr. Martin of $250,000.00.

With respect to the $722,913 bonus paid to him for 1990, the deductibility of which is in issue, minutes of petitioner's board of directors' meeting on June 27, 1990, state, in pertinent part:

> 5. Bonus to Lon D. Martin. Once again, the corporation has enjoyed a successful and profitable

fiscal year. The Directors recognize that this success continues to be due in large part to the efforts and expertise of President, Lon D. Martin. In light of this recognition and the fact that Mr. Martin's base salary has been continued at the same level for several years, the Directors unanimously agreed to pay Mr. Martin a total bonus of $722,913.00. This bonus is to be paid by the corporation's forgiving a debt of $82,566.00 due from Mr. Martin to the corporation and by paying the balance of $640,347.00 in cash to Mr. Martin.

From 1985 through 1991, Jerry Crispe's, Mrs. Martin's, and Mike's respective total annual compensation from petitioner was as follows:

### Mr. Crispe

| Year | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| 1985 | [1] | [1] | $4,300 |
| 1986 | [1] | [1] | 17,000 |
| 1987 | $42,564 | $14,917 | 57,481 |
| 1988 | 50,000 | 48,195 | 98,195 |
| 1989 | 50,000 | 58,650 | 108,650 |
| 1990 | 50,000 | 67,277 | 117,277 |
| 1991 | 157,073 | -- | 157,073 |

[1]No breakdown between salary and bonus is available.

### Mrs. Martin

| Year | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| 1985 | $8,000 | -- | $8,000 |
| 1986 | -- | -- | -- |
| 1987 | -- | -- | -- |
| 1988 | 1,200 | -- | 1,200 |
| 1989 | 13,800 | -- | 13,800 |
| 1990 | 24,000 | $33,060 | 57,060 |
| 1991 | 23,790 | -- | 23,790 |

### Mike

| Year | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| 1985 | [1] | [1] | $25,230 |

| | | | |
|------|---------|---------|---------|
| 1986 | [1] | [1] | 29,923 |
| 1987 | [1] | [1] | 37,409 |
| 1988 | $40,249 | $21,694 | 61,944 |
| 1989 | 41,937 | 21,897 | 63,835 |
| 1990 | 50,000 | 54,027 | 104,027 |
| 1991 | 72,529 | -- | 72,529 |

[1]No breakdown between salary and bonus is available.

On June 17, 1988, petitioner's directors adopted two separate formulas for determining the respective annual bonuses to be paid to Mr. Crispe and Mike. Minutes of the June 17, 1988, board of directors meeting state, in pertinent part:

> 5. <u>Bonus to Gerald A. Crispe</u>. The directors ratified and approved a bonus formula for Gerald A. Crispe for his services as Executive Vice President of the corporation, effective as of September 1, 1987. Mr. Crispe is to receive a bonus equal to 10% of the "net income" of the corporation. Net income for purposes of calculating Mr. Crispe's bonus is the income the corporation would have after deducting all taxes that would be incurred on the corporation's income before paying any executive bonuses. Mr. Crispe's bonus is payable annually, although advances against the bonus may be made more frequently.

> 6. <u>Bonus to Mike Martin</u>. The directors ratified and approved a bonus formula for Mike Martin for his services as Production Manager, effective January 1, 1988. His annual bonus shall be equal to 1/10th of 1% of the company's annual gross profits times the factor obtained by dividing the corporation's costs of goods sold by total sales. Mike's bonus is payable annually, although advances against the bonus may be paid more frequently.

Mr. Crispe and Mike received annual bonuses for 1988 through 1990 based on the above bonus formulas. In 1990, petitioner further paid to Mike an additional special bonus of $44,027, thus

giving him for that year a total bonus of $54,027.[2]

As indicated previously, Mrs. Martin received a $33,060 "bonus" for 1990.  This "bonus" was not determined pursuant to any fixed bonus formula.[3]

Petitioner's annual financial statements for its fiscal years from July 1, 1980, through June 30, 1990, reflect the following annual gross receipts and net profit or net loss after taxes:

| FYE JUNE 30 | Gross Receipts | Net Profit Or (Net Loss) After Taxes |
|---|---|---|
| 1981 | $313,131 | $38,482 |
| 1982 | 688,887 | 77,435 |
| 1983 | 954,902 | 66,425 |
| 1984 | 2,178,100 | 264,330 |
| 1985 | 2,692,567 | 184,821 |
| 1986 | 3,049,560 | 148,154 |
| 1987 | 3,545,513 | 179,645 |
| 1988 | 4,821,650 | 376,062 |
| 1989 | 4,581,509 | 382,755 |
| 1990 | 4,346,972 | (98,639) |

Its annual financial statements for this period further reflect the following total assets and net assets:

---

[2]Mike's $54,027 total bonus consisted of (1) the $10,000 regular bonus he earned under the bonus formula petitioner had adopted for him in 1988, and (2) the $44,027 special bonus he received "in recognition of his contribution to the manufacturing operations of the corporation."  Neither the regular nor the special bonus to Mike was challenged by respondent.

[3]In the notice of deficiency issued to petitioner, respondent originally determined that no portion of petitioner's $53,660 of purported total compensation to Mrs. Martin for its fiscal year ended June 30, 1990, was deductible as reasonable compensation.  As a result of a settlement concluded between the parties, they now agree that half of this $53,660 (which includes the $33,060 "bonus" to her) is deductible by petitioner.

| FYE JUNE 30 | Total Assets[1] | Net Assets[2] |
|---|---|---|
| 1981 | $147,158 | $43,482 |
| 1982 | 387,985 | 120,921 |
| 1983 | 432,667 | 187,346 |
| 1984 | 1,084,463 | 451,676 |
| 1985 | 1,104,384 | 636,497 |
| 1986 | 1,306,450 | 741,564 |
| 1987 | 1,516,691 | 921,209 |
| 1988 | 2,348,268 | 1,297,271 |
| 1989 | 2,527,392 | 1,691,979 |
| 1990 | 2,473,200 | 1,593,340 |

[1]Petitioner's cost for the assets, less accumulated depreciation.
[2]Total assets, less current and long-term liabilities.

Its annual financial statements for this period also reflect the following equity, annual return on equity, and cumulative average annual return on equity:

| FYE JUNE 30 | Equity[1] | Return on Equity[2] | Cum. Average Ret. on Equity[3] |
|---|---|---|---|
| 1981 | $43,482 | 88.50 percent | 88.50 percent |
| 1982 | 120,921 | 64.04 percent | 76.27 percent |
| 1983 | 187,346 | 35.46 percent | 62.66 percent |
| 1984 | 451,676 | 58.52 percent | 61.63 percent |
| 1985 | 636,497 | 29.04 percent | 55.11 percent |
| 1986 | 741,564 | 19.98 percent | 49.25 percent |
| 1987 | 921,209 | 19.50 percent | 45.01 percent |
| 1988 | 1,297,271 | 28.99 percent | 43.00 percent |
| 1989 | 1,691,979 | 22.62 percent | 40.73 percent |
| 1990 | 1,593,340 | (6.19) percent | 36.05 percent |

[1]Invested capital, plus retained earnings, less treasury stock.
[2]Net profit after taxes (see second preceding paragraph above), divided by equity.
[3]Sum of current year's return on equity and each prior year's return on equity, divided by petitioner's number of years of operation through current year.

In 1991, petitioner retained a business valuation company to appraise Mr. Martin's 100-percent stock interest in petitioner. In its appraisal report, this valuation company concluded that

Mr. Martin's stock interest had a fair market value of $9,250,000 as of October 25, 1991.

On January 1, 1992, Mr. Martin sold all of his stock in petitioner to Mike.

From its incorporation in June 1980 through January 1, 1992, petitioner declared and paid no formal dividends.

In the notice of deficiency issued to petitioner, respondent, among other things, disallowed petitioner's deduction of a $633,313 portion of its total compensation to Mr. Martin for its year ended June 30, 1990. The notice of deficiency stated, in pertinent part:

> the compensation of officer/shareholder Lon Martin claimed in the amount of $878,913.00 is overstated $633,313.00. It has not been established that an amount greater * * * [than] $245,600 is reasonable compensation for services provided by Lon Martin during the taxable year. Further, it has not been established that any amount represents payments for prior years in which Lon Martin may have been undercompensated. Accordingly, taxable income is increased $613,313.00 for the taxable year ended 6-30-90.

Respondent further determined that petitioner was liable for a penalty under section 6662(a) and (b)(2) with respect to the underpayment from the disallowed compensation deduction to Mr. Martin.


OPINION

Issue 1. Reasonable Compensation

Section 162(a)(1) allows as a business deduction "a reasonable allowance for salaries or other compensation for

personal services actually rendered".  A two-prong test
determines deductibility:  (1) Whether the amount of compensation
is reasonable in relation to services performed, and (2) whether
the payment is in fact purely for services rendered.  Sec. 1.162-
7(a), Income Tax Regs.  More specifically, bonuses paid to
employees are deductible "when * * * made in good faith and as
additional compensation for the services actually rendered by the
employees, provided such payments, when added to the stipulated
salaries, do not exceed a reasonable compensation for the
services rendered."  Sec. 1.162-9, Income Tax Regs.  Generally,
courts have focused on the reasonableness requirement in
determining the deductibility of purported compensation.
Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th
Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

The reasonableness of compensation is a question of fact to
be answered by considering and weighing all facts and
circumstances of the particular case.  Pacific Grains, Inc. v.
Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo.
1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553
(1990), affd. 965 F.2d 1038 (11th Cir. 1992).  Petitioner has the
burden of showing that it is entitled to a compensation deduction
larger than that allowed by respondent.  Rule 142(a); Nor-Cal
Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974),
affg. T.C. Memo. 1971-200.

Case law has provided an extensive list of factors that are

relevant in determining the reasonableness of compensation. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court. No single factor is dispositive. Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). In Elliotts, Inc. v. Commissioner, supra at 1245-1248, the Court of Appeals for the Ninth Circuit, to which this case is appealable, used a five-factor test: (1) The employee's role in the company; (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies; (3) the character and condition of the company; (4) whether a conflict of interest exists that might permit the company to disguise dividend payments as deductible compensation; and (5) whether the compensation was paid pursuant to a structured, formal, and consistently applied program.

The parties recognize the applicability of the Elliotts, Inc. test. However, they disagree concerning the amount of purported compensation to Mr. Martin that qualifies as reasonable compensation under that test.

Petitioner contends that the entire $878,913 Mr. Martin received is reasonable compensation. Although it acknowledges that Mr. Martin was given an "unusually high" bonus of $722,913, petitioner maintains this bonus represented reasonable compensation for his unique services.

Respondent, on the other hand, contends that only $245,600 is reasonable. Respondent argues that there was no compensatory purpose for the remaining balance, and that Mr. Martin arranged this large disguised dividend in preparation for selling petitioner to his son Mike.

Accordingly, we shall analyze and apply the factors enunciated by the Court of Appeals for the Ninth Circuit in Elliotts, Inc. v. Commissioner, supra, in order to determine reasonable compensation for Mr. Martin.

Petitioner and respondent offered the testimony of three expert witnesses. Petitioner's two experts, John Culbertson (Culbertson) and Pamela Jones (Jones), each own management consulting firms and have advised their respective corporate clients on executive compensation. Respondent's expert, Paul T. Clausen (Clausen), owns his own business valuation company and has testified as an expert witness on the valuation of business assets, business interests, and reasonable executive compensation in numerous court cases.

As trier of fact, we are not bound by the opinion of any expert witness and will accept or reject expert testimony, in whole or in part, in the exercise of sound judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), and cases thereat, affg. T.C. Memo. 1974-285.

A.  Role in the Company

The first factor focuses on the compensated employee's importance to the success of the business.  Pertinent considerations include the employee's position, hours worked, duties performed, and the general importance of the employee to the company.  American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972).  Where a large salary increase is at issue (similar to the instant case), it is further useful to compare past and present duties and salary payments.  Elliotts, Inc. v. Commissioner, supra at 1245.

Mr. Martin was petitioner's key employee and the primary reason for its success over the years.  As president, he was the driving force behind petitioner's success from its inception, and his personal services were essential to that success.  He managed and built up petitioner's business, designed its physical plant and layout, and trained other later members of its management team.

Although he had delegated some administrative duties and general business responsibilities to Mr. Crispe by the 1990 fiscal year in issue, Mr. Martin remained the driving force behind petitioner.  Further, while he was also devoting some time and attention to Caribe in Puerto Rico, being petitioner's

president remained his full-time job.[4]  Thus, any reduction in the hours he worked per week for petitioner must be balanced against his knowledge and experience in the industry and the valuable services he continued to render to petitioner during its 1990 fiscal year.

In 1989 and 1990, Mr. Martin was instrumental in developing petitioner's Micro Clean 100 process for producing clean room labels.  The resulting clean room labels were a technologically innovative, commercially promising, and potentially significantly profitable new product.  Over the short period from early 1990, when development work on the labels' production process was completed, through June 30, 1990, petitioner had $32,639 in sales of the new labels.  In June 1990, its directors anticipated the labels would contribute significantly to petitioner's profitability and financial success in future years.

However, Mr. Martin's 1990 bonus of $722,913 is almost three times the size of his prior largest annual bonus of $250,000 for 1988.  Indeed, on brief, petitioner acknowledges the 1990 bonus to be an "unusually high", "extraordinary one time" bonus.  The record further fails to reflect that part of this 1990 fiscal year compensation was to remedy petitioner's alleged prior undercompensation of Mr. Martin.

---

[4]The parties stipulated that his being petitioner's president was a "full-time job".

Although petitioner's expert Culbertson opined that the 1990 fiscal year compensation was justified because Mr. Martin had been undercompensated in prior years, he offered no analysis or explanation in support of his claim. In light of his failure to do so, we give his conclusion little weight.

Except for perhaps 1980 and 1981 (covering petitioner's first year and a half of operations), Mr. Martin appears to have been very well compensated in prior years. His 1984 total compensation of $352,200 was almost as much as his 1989 total compensation of $358,200, despite petitioner's enjoying a substantially better financial performance for its 1989 fiscal year than for its 1984 fiscal year. Petitioner's 1989 fiscal year gross receipts were more than twice its 1984 fiscal year gross receipts. Similarly, its 1989 fiscal year net profit after taxes was over 1.4 times its 1984 fiscal year net profit after taxes. Thus, any possible earlier undercompensation by petitioner of Mr. Martin was likely remedied long before 1990.

Further, pertinent minutes of the June 27, 1990, board meeting authorizing petitioner's payment of the 1990 bonus in issue make no mention that any part of this $722,913 was to compensate Mr. Martin for his services in prior years. Accordingly, we conclude that petitioner has failed to establish that some of the 1990 fiscal year compensation in issue was to remedy its alleged prior undercompensation of Mr. Martin. See

Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606; see also Estate of Wallace v. Commissioner, 95 T.C. at 553-554.

B. External Comparison

This second factor compares the employee's compensation with that paid by similar companies for similar services. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see sec. 1.162-7(b)(3), Income Tax Regs.

Based on their claimed knowledge of the compensation certain high-technology companies furnished their executives, petitioner's experts Culbertson and Jones were each of the opinion that the $722,913 bonus petitioner paid to Mr. Martin was reasonable. They noted that top executives at many high-technology companies typically receive stock options as part of their compensation package, and that these stock options can produce substantial compensation in the event the company's stock price rises greatly. However, as Jones noted, stock options could not be used by petitioner to compensate Mr. Martin, because Mr. Martin already owned a 100-percent stock interest in petitioner.

Jones was also of the opinion that Mr. Martin was actually entitled to even more compensation than he received, because, according to her, he performed multiple executive roles, including being petitioner's chief executive officer, vice president of marketing, vice president of sales, and chief

technical officer. She further asserted that he would have been entitled to royalties on petitioner's clean room labels, as chief technical officers of hi-tech companies typically will receive a royalty on the sales of any products they help develop.

Culbertson and Jones failed to offer any details concerning the specific high-technology companies upon which they based their opinions. They also offered no specifics on the particular executives involved, nor pertinent information on their particular qualifications and skills and the exact compensation they received. We thus are unable to determine: (1) How similar these other unidentified companies and their businesses are to petitioner; and (2) how similar the services their executives rendered are to the services Mr. Martin performed.[5]

Moreover, even if he were not petitioner's sole shareholder, we are skeptical that Mr. Martin, prior to and during the 1990 fiscal year, in addition to the salary and bonus he had already received, would also have been compensated by petitioner with stock options. We do not doubt that certain top executives of various high-technology companies typically will receive stock options as part of their compensation and that the stock options

[5]Both the parties and their experts argue at considerable length over whether or not petitioner is a high-technology company. Petitioner contends that it is a high-technology company, whereas respondent contends that petitioner is not. In our view, this dispute is neither helpful nor productive to our resolving the instant case.

granted them can often prove highly remunerative. However, as discussed previously, Mr. Martin generally does not appear to have been undercompensated in prior years. Also, we have no way of knowing the specific stock options petitioner's experts believed Mr. Martin, hypothetically, should otherwise have received, as they provided no further elaboration in connection with this point. The same is true of Jones' contentions about royalties.

With respect to petitioner's expert Jones' claim that Mr. Martin could have taken even more compensation from petitioner, we find questionable her suggestion that he performed the work of four full-time executives serving as petitioner's chief executive officer, vice president for marketing, vice president for sales, and chief technical officer. Although Mr. Martin may have performed some of the duties and functions of four such executives, he did not perform work equal to the full-time services of four such executives. Indeed, by the 1990 fiscal year in issue, he was devoting some of his time and attention to his other company, Caribe.[6]

In sum, petitioner's experts have failed meaningfully to

---

[6]To be sure, this Court and other courts in numerous reasonable compensation cases have considered the fact that the recipient performed more than one function for his employer, even though that individual's reasonable compensation may not be the sum of the amounts paid to a full-time employee in each such position. See PMT, Inc. v. Commissioner, T.C. Memo. 1996-303.

compare the executive compensation provided by other companies they selected to the situation presented in the instant case. Consequently, we give petitioner's experts' above opinions little weight.

Respondent's expert Clausen examined other companies in the printing industry. Clausen selected three public companies to compare to petitioner. Two of these companies were much larger than petitioner, particularly in terms of their respective 1990 annual sales and number of employees. The third company (whose 1990 annual sales were somewhat closer to petitioner's) was far less profitable than petitioner, and was acknowledged by Clausen as not being reasonably comparable to petitioner. In determining Mr. Martin's reasonable compensation, Clausen further considered two 1990 surveys of executive compensation in the printing industry. However, he acknowledged these surveys to be only of limited use in determining what might be reasonable compensation in a particular company's case.

Clausen opined that reasonable compensation to Mr. Martin for the 1990 fiscal year would be $230,000, consisting of a $120,000 salary and a $110,000 bonus. He noted that Mr. Martin's $878,913 in salary and bonus exceeded the 1990 total cash compensation of each chief executive officer of the two large public printing companies he examined.

None of the three public printing companies Clausen selected

was reasonably comparable to petitioner. The largest company had sales for 1990 of $191 million and a pretax profit of $26 million, and employed a total of 1,884 employees. The next largest company had sales for 1990 of $65 million and a pretax profit of $3 million, and employed a total of 450 employees. Respondent argues that Mr. Martin's reasonable compensation cannot exceed the cash compensation received by these two chief executive officers of much larger printing companies.

However, as petitioner points out, Clausen failed to take into account the stock options the chief executive officers of the two larger printing companies previously were granted. The compensation they earned from these stock options appears to have been substantial. In any event, the two larger printing companies Clausen chose are not reasonably comparable to petitioner. Moreover, as Clausen acknowledged, the two industry surveys he consulted are of only limited use in determining Mr. Martin's reasonable compensation. Accordingly, the Court does not accept Clausen's opinion concerning Mr. Martin's reasonable compensation for the 1990 fiscal year.

### C. Character and Condition of Company

This third factor considers the company's character and condition. Relevant considerations are the company's size as measured by its sales, net income, or capital value; the complexities of the business; and general economic conditions.

Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see E. Wagner & Son, Inc. v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937).

Petitioner was a relatively small label and printing company that grossed more than $4 million annually for its 1988 through 1990 fiscal years. It had secured itself a nice market niche in supplying certain custom-designed products to a number of high-technology companies, thus enabling it to earn high profit margins on its product sales.

Moreover, as petitioner's directors correctly anticipated in June 1990, its recently developed clean room labels would produce significant profits and give petitioner a competitive advantage in future years. From 1991 through 1996, the new clean room labels helped reverse the slight decline in business petitioner experienced during its 1989 and 1990 fiscal years. Also, Mr. Martin's 100-percent stock interest in petitioner was subsequently appraised by a business valuation company to have a fair market value of $9.25 million, as of October 25, 1991. In years after 1990 and 1991, the labels were probably the single most important factor in spurring petitioner to even greater sales and profitability.

All in all, from its inception through the 1990 fiscal year, petitioner has been an extremely well managed and profitable company. It had a very lean management team and by the 1990 fiscal year enjoyed an excellent reputation in the label

and printing industry.

D.  Conflict of Interest

This fourth factor examines whether a relationship exists between the company and employee that might permit the company to disguise nondeductible corporate distributions as section 162(a)(1) deductible compensation.  Thus, close scrutiny must be given where the paying corporation is controlled by the compensated employee, as in the instant case.  Elliotts, Inc. v. Commissioner, supra at 1246-1247.  However, "The mere existence of such a relationship, * * * when coupled with an absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high."  Id. at 1246.  Instead, the fact finder is further to adopt the perspective of an independent investor in determining whether the investor would be satisfied with the company's return on equity after the compensation in issue was paid.  Id. at 1247.

As a result of its payment of the $722,913 bonus to Mr. Martin, petitioner had a $98,639 loss and a negative 6.19 percent return on equity for the 1990 fiscal year.  We do not think an independent investor would be happy with such a negative return on equity, especially where the "unusually high" bonus payment producing the loss for the fiscal year is equal to approximately 45.37 percent of the investor's equity in the company ($722,913 divided by $1,593,340 net assets).

Petitioner, nevertheless, asserts that an independent investor would still be satisfied with the corporation's 36.05 percent cumulative average annual return on equity through the 1990 fiscal year. We disagree.

In our opinion, the cumulative average annual return on equity petitioner experienced over the period from July 1, 1980 through June 30, 1990, would not be as significant to an independent investor as the corporation's return on equity for the current 1990 fiscal year in issue. Indeed, the record reflects that petitioner's directors' usual practice had been to tie Mr. Martin's annual bonus to the corporation's financial performance during the recent fiscal year. Also, the higher 36.05 percent cumulative average annual return is somewhat skewed by the much higher annual returns on equity petitioner enjoyed during its earlier years of operation, when its equity was much lower.

E. Internal Consistency

The fifth factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program. Bonuses not paid pursuant to such plans are suspect. Similarly, bonuses paid to controlling shareholders are also suspect "if, when compared to salaries paid non-owner management, they indicate that the level of compensation is a function of ownership, not corporate management responsibility." Elliotts,

Inc. v. Commissioner, supra at 1247.

Petitioner's "unusually high", "extraordinary one time" 1990 bonus of $722,913 to Mr. Martin represented a departure from its normal annual bonus practice for him.  As reflected by minutes of the June 17, 1988, board meeting, petitioner's directors' usual practice had been to tie Mr. Martin's annual bonus, in large part, to petitioner's financial performance during the recent fiscal year.  Yet, Mr. Martin's 1990 bonus was almost three times the size of his 1988 bonus of $250,000, even though petitioner enjoyed significantly higher gross receipts (as well as a substantially higher net profit after taxes) for its 1988 fiscal year than for its 1990 fiscal year.

We do not accept petitioner's and its expert's arguments that the 1990 bonus of $722,913 was justified because of Mr. Martin's instrumental efforts in developing the Micro Clean 100 process.  Although petitioner's directors anticipated the resulting clean room labels would be significantly profitable in future years, petitioner's later financial success with the new labels was by no means certain as of the end of the 1990 fiscal year.  Most importantly, we do not believe that an independent investor would approve of paying Mr. Martin this large $722,913 "bonus", when the new labels' profit prospects were still uncertain and yet to be confirmed.  While Mr. Martin is entitled to some 1990 bonus for his efforts in developing petitioner's

clean room labels, in our opinion the $722,913 bonus payment to him far exceeds a reasonable bonus. See, PMT, Inc. v. Commissioner, T.C. Memo. 1996-303 (shareholder-employee entitled to additional compensation of $400,000 for his prior invention of corporation's new fabric product; new fabric accounted for a $10 million increase in the corporation's sales during the year in issue and corporation also enjoyed a high return on equity for that year).

### F. Amount of Reasonable Compensation.

We consider the $156,000 salary Mr. Martin received to be reasonable. As president, he managed a business that grossed more than $4 million annually for its 1988 through 1990 fiscal years. He had also received approximately the same annual salary since at least 1985.

In addition, Mr. Martin should receive a bonus, as it had been petitioner's practice to provide him a substantial portion of his compensation in the form of an annual bonus tied to petitioner's financial performance during the recent fiscal year. We consider a 1990 bonus of $250,000 to him to be reasonable. Although petitioner's business slightly declined for the 1990 fiscal year, the decline had been expected and was attributable to factors beyond Mr. Martin's control. Moreover, petitioner still grossed over more than $4.34 million for the fiscal year. Also, as indicated previously, Mr. Martin is entitled to some

bonus for his efforts in successfully developing the Micro Clean 100 process.

This $406,000 of reasonable compensation, we estimate, results in a revised return on equity for petitioner of approximately 10.20 percent for the 1990 fiscal year.[7] We think an independent investor would be satisfied with this return on equity and with petitioner's 1990 fiscal year financial performance. Despite the slight decline in business experienced for that year, Mr. Martin still had done an excellent job in managing petitioner. As previously discussed, petitioner was encountering increased competition in the Portland market and was experiencing some loss of sales due to its customers' relocating their manufacturing facilities overseas. Moreover, petitioner

---

[7]Petitioner's organizational minutes provide that if the Internal Revenue Service or a court of competent jurisdiction determines any "salary to any stockholder officer" to be a dividend, the payment shall immediately be treated as a loan to the officer (with interest payable at the legal rate from the date of payment thereof), due and payable within 1 year from the date of determination. If Mr. Martin's total compensation was $406,000, rather than $878,913, petitioner's 1990 fiscal year income would be increased $472,913, giving it a revised net income before taxes of $320,274 (the ($152,639) net loss reflected on the 1990 fiscal year financial statement, plus $472,913). Assuming combined Federal and State income taxes are imposed equal to 40 percent of this revised net income before taxes, petitioner's revised net taxable income after taxes would be $192,164 ($320,274 multiplied by 60 percent) and its revised equity would be $1,884,143 (revised retained earnings, plus invested capital, less treasury stock, per 1990 fiscal year financial statement). This would represent a revised return on equity of approximately 10.20 percent ($192,164 divided by $1,884,143).

had just finished successfully developing its commercially promising and potentially significantly profitable new clean room labels.

We hold that petitioner is entitled to a $406,000 deduction under section 162 as reasonable compensation to Mr. Martin for its year ended June 30, 1990.

Issue 2.  Accuracy-Related Penalty

Respondent determined that petitioner was liable for a penalty under section 6662(a) and (b)(2) for substantial understatement of its income tax for the year ended June 30, 1990.

An understatement of income tax is substantial if it exceeds the greater of:  (1) 10 percent of the tax required to be shown on the return, or (2) for a corporation, $10,000.  Sec. 6662(d)(1).  As relevant to the instant case,[8] any understatement is reduced by the portion of the understatement attributable to an item for which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.  Sec. 6662(d)(2)(B)(ii).[9]  For

---

[8]In the notice of deficiency, respondent determined that the entire underpayment for the year ended June 30, 1990, was attributable to non-tax-shelter items.

[9]The Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), Pub. L. 103-66, sec. 13251(a), 107 Stat. 531, amended sec. 6662(d)(2)(B)(ii), to also require a reasonable basis for the tax
(continued...)

the year under consideration, respondent provided guidance totaxpayers by means of Notice 90-20, 1990-1 C.B. 328, and Rev. Proc. 90-16, 1990-1 C.B. 477.[10]

Rev. Proc. 90-16, section 4(b)(4), 1990-1 C.B. at 478, provides that, for purposes of reducing any understatement of income tax under section 6662(d), additional disclosure of facts with respect to an issue involving the reasonableness of officers' compensation is unnecessary, where the Schedule E (Compensation of Officers) to the Form 1120 is completed in a clear manner and in accordance with its instructions. Section 4(b)(4) of Rev. Proc. 90-16 further requires that the time devoted by the officer to the business be expressed as a specific percentage.

In addition, section 6664(c)(1) provides that a penalty under section 6662 shall not be imposed on any portion of an underpayment if the taxpayer shows reasonable cause for such

---

[9](...continued)
treatment of the item. However, this amendment is effective only for returns the due dates for which (determined without regard to extensions) are after Dec. 31, 1993, and is not applicable to the instant case. OBRA 1993, sec. 13251(b), 107 Stat. 531. Petitioner's return for the year ended June 30, 1990, was due on or before Sept. 15, 1990. Sec. 6072(b).

[10]Sec. 1.6662-4(e) and (f), Income Tax Regs., is not applicable because they were issued to apply prospectively with respect to income tax returns due after Dec. 31, 1991. See T.D. 8381, 1992-1 C.B. 374, 375. However, absent further guidance, taxpayers may rely on the rules set forth in Notice 90-20, 1990-1 C.B. 328, 330, and Rev. Proc. 90-16, 1990-1 C.B. 477.

portion of the underpayment and that the taxpayer acted in good faith with respect to such portion.  Reliance on the advice of a professional, such as an accountant, may constitute a showing of reasonable cause if, under all the facts and circumstances, such reliance is reasonable and the taxpayer acted in good faith. Sec. 1.6664-4(c), Income Tax Regs.

Petitioner asserts that no penalty under section 6662(a) and (b)(2) should be imposed.  It maintains that, pursuant to Rev. Proc. 90-16, supra, its return for the year ended June 30, 1990, adequately disclosed the relevant facts concerning its claimed compensation deduction to Mr. Martin.  Alternatively, petitioner argues that it qualifies under the section 6664(c)(1) reasonable-cause-and-good-faith exception to the penalty.  We agree with petitioner that there was adequate disclosure in its return, since a properly completed Schedule E concerning its officers' compensation was included in petitioner's return.  We hold that petitioner is not liable for a penalty under section 6662(a) and (b)(2) for the year ended June 30, 1990.  Notice 90-20, supra; Rev. Proc. 90-16, supra.

To reflect the foregoing and the parties' concessions,

Decision will be entered

under Rule 155.