T.C. Memo. 2002-109

UNITED STATES TAX COURT

INTERNATIONAL CAPITAL HOLDING CORP.
AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6512-00.                    Filed May 1, 2002.

David D. Aughtry and Charles E. Hodges II, for petitioners.

Donald W. Williamson, Jr., Carolyn L. Rountree, and Gary F.
Walker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioners sought redetermination of
deficiencies in Federal income taxes and accuracy-related
penalties determined by respondent as follows:

|       |            | Accuracy-related Penalty |
| Year  | Deficiency | Sec. 6662 |
| 1995  | $244,906   | $48,981 |
| 1996  | 333,094    | 66,619 |

After concessions by the parties, we must decide whether amounts paid by petitioners to a related corporation are deductible as compensation under section 162(a)(1).[1]  We hold they are.

FINDINGS OF FACT

Many facts were stipulated, and we incorporate by this reference the parties' stipulation of facts and the accompanying exhibits.  When the petition was filed, petitioners' principal places of business were in Georgia.

1.  Petitioners

Petitioners are an affiliated group of corporations, which filed consolidated Federal income tax returns for 1995 and 1996 using an accrual method of accounting.  The group's parent corporation is International Capital Holding Corporation (ICHC), a holding company.

From September 1987 through 1996, the affiliated group included ICHC and subsidiaries NC Acquisition Corporation (NCAC); Resort Designs, Inc. (RDI); and Norcom, Inc.  ICHC has owned a controlling interest in NCAC from the time of NCAC's formation on

---

[1]  Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the subject years.  Rule references are to the Tax Court Rules of Practice and Procedure.

August 1987.  In September 1987, NCAC purchased 100 percent of the common stock of Norcom in a leveraged buyout.  Norcom is the only operating company in petitioners' affiliated group.  It manufactures and wholesales school supplies, such as notebooks, filler paper, and binders.  From the time of its acquisition by NCAC through the end of 1996, Norcom has been a thinly capitalized and highly leveraged company.

    2.   Petitioners' Owners

During all time periods relevant to this case, petitioners were controlled by H. Ross Arnold (Mr. Arnold).  From September 1987 through January 1991, Mr. Arnold owned 82.33 percent of ICHC.  From January 1991 through 1996, ICHC was 100-percent owned by Mr. Arnold.[2]

Mr. Arnold is a nonpracticing attorney who previously worked in investment banking.  Mr. Arnold is in the business of purchasing small and medium-sized closely held companies through leveraged buyouts.  Generally, Mr. Arnold does not involve himself in his individual capacity in the day-to-day operations of the companies he owns.  Instead, Mr. Arnold uses another company he owns, Quest Capital Corp. (Quest), to provide

_____

[2] The only other ownership interests in petitioners were held by Paul F. Lombardi (Mr. Lombardi) and Mr. Arnold's wife. Mr. Lombardi owned approximately 1 percent of the common stock of NCAC from April 1990 through April 1994.  From April 1994 through the end of 1996, Mr. Arnold's wife owned 1 percent of NCAC.

financial, investment, and strategic management services to his portfolio of companies.[3]

3. Quest

Quest is a private investment management company. Since its incorporation, Mr. Arnold has been Quest's sole shareholder and president. Mr. Arnold has been a member of Quest's board of directors since October 1990, and its sole member since December 1993. Quest is not a member of petitioners' affiliated group.

Quest employs people who are specially trained in accounting, finance, management, or law. From 1987 through 1996, Quest employed at least two attorneys, numerous C.P.A.s, and many individuals with MBA degrees. Quest's primary purpose is to provide financial and investment advice to Mr. Arnold and his portfolio of companies, including Norcom. For example, Quest was actively involved in the equity and debt financing of the portfolio companies and annually reviewed 30 to 40 potential acquisitions for Mr. Arnold or one of his controlled companies, including Norcom.

4. The Acquisition of Norcom

When NCAC acquired Norcom in 1987, Norcom had incurred numerous years of operating losses. The leveraged acquisition of Norcom was accomplished largely through an $18 million line of

---

[3] Prior to June 1989, Quest operated as a sole proprietorship owned by Mr. Arnold.

credit from Bank South, which provided funds to acquire Norcom and a line of credit for working capital. Mr. Arnold personally guaranteed the Bank South loan. Additionally, Messrs. Arnold and Lombardi each lent small amounts of cash to ICHC to help NCAC acquire Norcom.

The loan agreement with Bank South included numerous restrictions on Norcom's activities, two of which are relevant to this case. First, the loan agreement prohibited Norcom from declaring distributions without the bank's approval. Second, the aggregate amount of compensation Norcom could pay to its officers and directors was restricted to 110 percent of the prior year's total. In early 1990, Norcom requested and was granted a waiver of these restrictions for Norcom's fiscal year that ended on January 31, 1990. Norcom requested a waiver of the restriction on distributions because it had declared a $1.6 million dividend in August 1989. At least a portion of the dividend was requested by Bank South so that another member of the affiliated group, RDI, could pay off a loan from Bank South, which RDI did not have the ability to pay. This was the only dividend Norcom declared from 1987 through the end of 1996.

In February 1991, LaSalle National Bank replaced Bank South as Norcom's primary lender. LaSalle provided Norcom with an extension of credit in the amount of $23.5 million. Mr. Arnold personally guaranteed at least $2 million of this debt. Like the

agreement with Bank South, the agreement with LaSalle prohibited Norcom from declaring distributions.  Although the LaSalle agreement did not expressly limit the amount of compensation Norcom could pay to its officers, directors, or outside consultants, a net worth requirement in the agreement prevented Norcom from paying major fees without consulting LaSalle.  From May 1991 through December 1996, the LaSalle line of credit was amended 11 times.

5.  <u>Services Which Quest Provided to Norcom</u>

At the heart of the factual dispute in this case is the extent to which Quest provided consulting services to Norcom. Petitioners claim that at least since the early 1990s Norcom's management team lacked anyone who carried out the duties of a chief financial officer (CFO).  According to petitioners, Quest served as the CFO, without being fully compensated.  Respondent claims that Norcom had a full management team and that Quest was fully compensated for any services it provided.

a.  <u>September 1987 to April 1992</u>

From shortly after its acquisition in 1987 through April 1992, Norcom had an essentially complete management team for a company of its size.  In relevant part, Norcom's management team

consisted of Mr. Arnold, Mr. Lombardi, Joseph Zelazny, and Vince Ciccarello.[4]

Mr. Arnold was the chairman and a member of the board of directors of Norcom since its acquisition.[5] He also served as Norcom's secretary from September 1988 to June 1992. Mr. Arnold did not keep an office at Norcom's facilities and was not actively involved in Norcom's day-to-day management. Norcom did not compensate Mr. Arnold for his work until he began receiving a salary in 1991.

Norcom's day-to-day management was largely handled by Mr. Lombardi, a CPA who possessed significant management experience. He served as CEO, treasurer, and assistant secretary of Norcom from the time it was acquired in 1987, and in September 1988 also became president of Norcom. Mr. Lombardi was responsible for all aspects of Norcom's operations, including strategic planning, budgeting, negotiating with lenders, manufacturing, sales and marketing, acquiring equipment, and hiring personnel. Mr. Lombardi was compensated each year of his employment at Norcom until he resigned in April 1992.

---

[4] Mr. Ciccarello was the vice president of sales and marketing. In August 1993, he was replaced by Ted Crews III. The sales and marketing responsibilities are not material to this case and are not discussed further.

[5] Mr. Arnold was the sole member of Norcom's board of directors at the times Norcom made the two disallowed payments.

Mr. Zelazny has been Norcom's controller since 1987. His responsibilities included, among other things, oversight of Norcom's day-to-day cash management, preparation of monthly and annual financial statements, and dealings with Norcom's accountants. Although Mr. Zelazny was involved in dealings with Norcom's lenders, for the most part he was not responsible for finding potential lenders, negotiating agreements with the lenders, finding additional sources of equity financing, or fulfilling other functions typically assigned to a CFO.

Quest's involvement with Norcom before Mr. Lombardi's resignation in April 1992 was limited. Quest employees were involved in acquiring Norcom; seeking additional equity financing; obtaining debt financing; renegotiating loan agreements, including both the Bank South and LaSalle lines of credit; and overseeing Norcom's operations, including its real estate and long-term growth plan. These Quest services were largely provided by Mr. Arnold, Robert Wright, John McColl, and their support staffs.

When these services were provided by Quest, there was no written agreement requiring Norcom to compensate Quest. While only Mr. Arnold testified as to the existence of an oral agreement between Quest and Norcom, numerous Quest employees testified that Norcom was not paying Quest because at that time payments were not permitted by Norcom's lenders. In fact, no

compensation was paid by Norcom to Quest before April 1992. However, minimal expenses Quest incurred in 1991 were reimbursed by Norcom.

b. April 1992 Through 1996

The relationship between Quest and Norcom changed significantly in April 1992 when Mr. Lombardi resigned from Norcom. Immediately after Mr. Lombardi's resignation, Mr. McColl assumed oversight of the day-to-day operations of Norcom, especially with respect to oversight of Norcom's finances.[6] Mr. McColl moved his office to Norcom and worked at Norcom on a full-time basis. In addition to oversight of Norcom's operations, Mr. McColl became a Norcom officer.[7] From June 1992 until December 1993, he served as Norcom's secretary and treasurer. From August 1992 until December 1993, he also served as the executive vice president of Norcom. The record does not indicate that Mr. McColl was ever compensated by Norcom.

---

[6] Mr. Arnold at least nominally assumed some of Mr. Lombardi's responsibilities by temporarily taking the positions of president and CEO of Norcom. Despite holding these offices, the evidence does not indicate that Mr. Arnold was actively involved in the management of Norcom.

[7] Petitioner claimed that Mr. McColl was not an employee of Norcom. Because respondent has not disputed this claim, we have accepted it as a stipulated fact. Accordingly, we have not considered whether Mr. McColl was an employee of Norcom for Federal tax purposes and that any work he performed for Norcom was under such employment and not on behalf of Quest. Sec. 3121(d)(1) (defining an employee of a corporation to include its officers).

In addition to his oversight of Norcom's operations, Mr. McColl made two important hiring decisions at Norcom. First, in August 1992 he hired Richard Cross III to be Norcom's interim, part-time president. Thereafter, Messrs. McColl and Cross worked together as coleaders of Norcom. Mr. Cross worked 2.5 days per week, while Mr. McColl worked full time at Norcom. Responsibility for operational, sales, and marketing issues fell primarily on Mr. Cross, while Mr. McColl focused on the financial management of Norcom. Mr. Cross continued to be Norcom's president until April 1993. At that time, Mr. Cross assumed the title of CEO, which he held until December of 1993. Norcom paid $459,340 for 17 months of work by Mr. Cross.

In April 1993, Mr. McColl hired Hal Rahn to replace Mr. Cross as Norcom's president. Mr. Rahn continued to serve in that capacity through 1996. Like Mr. Cross, Mr. Rahn focused on operational, sales, and marketing issues at Norcom. High-level financial and investment issues continued to be handled by Mr. McColl and others at Quest. Norcom compensated Mr. Rahn for his services.

In 1993 Mr. McColl also elevated Mr. Zelazny to vice president of finance. Although Mr. Zelazny was given an additional title in 1993, his duties continued to be primarily that of a controller. Norcom has not employed any senior level officers with significant financial expertise or experience after

Mr. Lombardi resigned in 1992. Instead, Norcom looked to Quest to carry out the duties of a CFO.

Since acquiring Norcom in 1987, Mr. Arnold has assigned a high-ranking Quest employee with expertise in financial and investment issues to oversee the financial management of Norcom. Initially, Robert Wright provided such oversight. On or about the time of Mr. Lombardi's resignation in 1992, Mr. McColl served this role, and Quest substantially increased the services it provided to Norcom. In 1994, Robert Espy became the Quest officer responsible for management of Norcom's finances. During 1995 and 1996, Mr. Espy and his staff were actively involved in Norcom's financial management.

The services Quest provided to Norcom from 1987 through 1996 were mostly financial and investment advice. These included consulting on Norcom's bank loans, financing of equipment, leases, acquisition and sale of real property, and development of business plans. Quest played a critical role in negotiating Norcom's consolidation of its operations from four facilities down to a single, larger plant, which was accompanied with a sale/leaseback of the new plant. Quest personnel also reviewed Norcom's monthly and annual financial statements, as would a CFO. Quest hired at least two high ranking Norcom officers: Mr. Cross as president in 1992 and Mr. Rahn as president in 1993. Quest personnel typically were not involved in the day-to-day

operations of Norcom, with the exception of Mr. McColl's work in 1992-93.

6. <u>Payments From Norcom to Quest</u>

Norcom did not make any payments to Quest before 1991 for management services. In October 1991, Norcom paid Quest $1,716 to reimburse Quest for expenses incurred by Mr. McColl in a meeting he conducted with LaSalle regarding Norcom's loan. This appears to be the only pre-1992 payment from Norcom to Quest that relates to consulting services provided by Quest. From July through December 1993, Quest issued monthly invoices to Norcom for $3,146 for a "consulting fee." From July 1993 through the end of 1996, Quest regularly issued invoices to Norcom for reimbursement of expenses. Also, in July 1993, Norcom paid to Quest $76,000 for "management services" Quest provided to Norcom.

On January 1, 1994, Norcom and Quest entered into a formal consulting agreement (the 1994 consulting agreement). The 1994 consulting agreement provided that Quest would provide to Norcom advice on financial, strategic planning, and operational issues. In turn, Norcom was required to pay Quest an annual consulting fee of $62,500, payable in monthly installments of $5,208.33. From the beginning of 1994 through the end of 1996, Norcom paid Quest the monthly consulting fees. Respondent did not challenge the deductibility of these compensation payments.

The 1994 consulting agreement had the following integration clause:

> Entire Agreement, Amendments and Modification.  This Agreement supersedes in the entirety any and all prior agreements or arrangements between the parties with respect to the subject matter hereof, and this Agreement may not be amended or modified in any respect other than by a writing that references this Agreement, is signed by the party against whom the amendment or modification is sought to be enforced.

The 1994 agreement was later revised to include the following clause:

> (b) Other Fees.  From time to time, additional compensation will be paid to * * * [Quest] based upon the extent of involvement in and services provided to NORCOM at the discretion of the Board of Directors.

In September 1995, Mr. Espy proposed to Mr. Rahn that Norcom make a payment to Quest that would be in addition to the monthly consulting fee of $5,208.33.  Messrs. Espy and Rahn agreed that Norcom would pay Quest $1 million for services Quest had previously provided to Norcom.  Later, Messrs. Rahn and Espy approached Mr. Arnold to obtain his approval of the payment, which he granted.  Before the payment could be made, Norcom and Quest had to ensure that any payment to Quest would not violate any terms of its loan agreement with LaSalle.  In the fall of 1995, Messrs. Arnold and Espy sought LaSalle's consent to the proposed payment.  LaSalle granted its consent for Norcom to make the payments to Quest as compensation for services provided by Quest.

After securing LaSalle's consent to the $1 million payment, Messrs. Espy and Rahn collaborated in the preparation of the following resolution for Norcom's Board of Directors:

> WHEREAS, certain employees of Quest Capital Corp. have conducted meetings with and given consultations to * * * [Norcom's] management, provided advisory services in marketing, strategic planning, systems, and technical operations, advised the Corporation's employees and negotiated on behalf of * * * [Norcom] in connection with numerous bank transactions, reviewed and analyzed monthly financial statements and the annual operating budget for 1996, and acted as general consultant to * * * [Norcom] as to its productivity and profitability; and
>
> WHEREAS, the president has proposed to the board that * * * [Norcom] pay a management fee to Quest Capital Corp. in the amount of $1,000,000.00 in consideration for the aforementioned services;
>
> THEREFORE IT IS RESOLVED, that the president is authorized and directed by the board of directors to pay the amount of $1,000,000.00 to Quest Capital Corp. for the consulting services described herein.

On December 14, 1995, Mr. Arnold, Norcom's sole director at the time, executed the resolution. On December 29, 1995, Norcom paid $1 million to Quest as a management fee.

As part of its audit of Norcom's 1995 books, Norcom's outside accountants advised petitioners that they should treat a portion of the payment as a dividend to obtain the benefits of certain tax credits. In response to this suggestion, Norcom and Quest reiterated their intention that the entire payment was compensation for services rendered and should be treated as such.

Effective August 1, 1996, Mr. Rahn, as Norcom's president, and Mr. Espy, as Quest's Chief Operating Officer, executed a second consulting agreement (the 1996 consulting agreement).  In the 1996 consulting agreement, Norcom stated that it desired Quest to provide "management, banking, and marketing services in connection with the operation of * * * [Norcom's] business, bank relationship, vendor relationships and customer relationships".

The 1996 agreement provided that, for 5 years, Quest would provide the following services to Norcom:

> a) Reporting and Financial Planning Services - Assistance and review of all reports required pursuant to loan agreements and other financing arrangements to which * * * [Norcom] is a party; review, renegotiate and extend the lines of credit made abailable [sic] by its lending institution; review of financial statements, annual budgets, projections, insurance reports, and other financial reports necessary for the operation of * * * [Norcom's] business.
>
> b)  Consulting Services - Consulting and advisory services in regard to international marketing, strategic planning, systems, technical operations and such other matters as * * * [Norcom] deems reasonably necessary for the conduct of its business.
>
> c)  Equipment - Assistance in determining lease versus buy decisions on new equipment; negotiate bank financing on new equipment purchases and provide overall consultation as to the cost/benefit relationship of acquiring said equipment.

Under the 1996 agreement, Quest was to be compensated as follows:

> a) During the term of this Agreement, a yearly fee will be paid equal to approximately 10% of the gross profit of * * * [Norcom] based on internally prepared financial statements.  Pursuant to the terms and conditions of * * * [Norcom's] loan agreement with LaSalle National Bank, payments approximating 25% of the total fee will be made on October 10th of each year with the remaining 75% of the estimated fee paid during the last week of the fiscal year of * * * [Norcom].  No payment will be made under this agreement if it were to cause an event of default under any covenant in the LaSalle National Bank Loan Agreement.  In addition, management of * * * [Norcom] and the Board of Directors will decide each year what additional fees, if any, will be payable to Quest based on the services rendered and the amount of time involved by Quest personnel.

For the months of September through December 1996, Quest also issued invoices at the monthly rate of $10,000.  Norcom promptly paid the amounts invoiced.  Respondent did not challenge the deductibility of these payments.

During the fall of 1996, Messrs. Rahn and Espy commenced discussions concerning the amount of compensation to be paid to Quest during 1996.  They relied on the same considerations underlying the 1995 payment.  Mr. Espy, with input from Messrs. Arnold and Rahn, then drafted the following resolution for Norcom's board of directors:

> WHEREAS, certain employees of Quest Capital Corp. have conducted meetings with and given consultations to * * * [Norcom's] management, provided advisory services in marketing, strategic planning, systems, and technical operations,

advised the Corporation's employees and negotiated on behalf of * * * [Norcom] in connection with numerous bank transactions, renegotiated and extended the existing bank line with LaSalle National Bank, reviewed and analyzed monthly financial statements and the annual operating budget for 1997, and acted as general consultant to * * * [Norcom] as to its productivity and profitability; and

WHEREAS, the president has proposed to the board that * * * [Norcom] pay a management fee to Quest Capital Corp. in the amount of $700,000.00 in consideration for the aforementioned services, this amount being consistent with the Services Agreement and the amounts paid in 1994 and 1995 which are hereby ratified as to amount and prior year's consistent practice and methodology;

THEREFORE IT IS RESOLVED, that the president is authorized and directed by the board of directors to pay the amount of $700,000.00 to Quest Capital Corp. for the consulting services described herein.

In December 1996 Norcom's board of directors executed the resolution, and $700,000 was paid to Quest as a management fee.

OPINION

We must decide whether the payments from Norcom to Quest are deductible under section 162(a)(1).[8] Section 162(a)(1) allows a

---

[8] That section provides:

SEC. 162(a). In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--

(continued...)

business to deduct "a reasonable allowance for salaries and other compensation for personal services actually rendered" as an ordinary and necessary business expense.  In this case, deductibility requires that the payment be (1) purely for services rendered and (2) reasonable in amount. Trinity Quarries, Inc. v. United States, 679 F.2d 205 (11th Cir. 1982); Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); Paula Constr. Co. v. Commissioner, 58 T.C. 1055 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); Law Offices--Richard Ashare, P.C. v. Commissioner, T.C. Memo. 1999-282; sec. 1.162-7(a); Eyefull, Inc. v. Commissioner, T.C. Memo 1996-238; Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129, Income Tax Regs.

It is well established that a payment is deductible as compensation only to the extent that it was actually intended as such.  Elec. & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Eyefull, Inc. v. Commissioner, supra.  Whether such intent existed is a factual question to be decided on the basis of the facts and circumstances of the case.  Paula Constr. Co. v. Commissioner, supra at 1059.  The burden of proof rests upon

---

[8](...continued)
> (1) a reasonable allowance for salaries
> or other compensation for personal services
> actually rendered;

petitioners to prove that they are entitled to deduct an amount greater than that determined by respondent.[9]  Rule 142(a); <u>Paula Constr. Co. v. Commissioner</u>, <u>supra</u> at 1058; <u>Elec. & Neon, Inc. v. Commissioner</u>, <u>supra</u> at 1340.

While compensation for personal services is a deductible expense, distributions of corporate earnings and profits constitute dividends and are not deductible.  Therefore, a corporation has an incentive to characterize as compensation payments which are actually distributions of profits.  Sec. 1.162-7(b)(1), Income Tax Regs.  Thus, the Court must closely scrutinize the alleged compensation paid to determine if it is a disguised distribution of profits.  <u>Pulsar Components Intl, Inc. v. Commissioner</u>, <u>supra</u>; <u>Mad Auto Wrecking, Inc. v. Commissioner</u>, T.C. Memo. 1995-153.

The provision of services by one company to another company does not alone establish the existence of a business relationship consistent with the payment of compensation.  <u>Eyefull, Inc. v. Commissioner</u>, <u>supra</u> (citing <u>Paula Constr. Co. v. Commissioner</u>, <u>supra</u> at 1058).  "There must also be evidence that at the time

_____

[9]  Pursuant to sec. 7491, the burden of proof can be shifted to respondent if certain conditions are met, including that the examination was commenced before July 22, 1998.  Internal Revenue Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727; <u>Higbee v. Commissioner</u>, 116 T.C. 438 (2001).  The examination in this case commenced before the effective date.  Accordingly, sec. 7491 is not applicable to this case.

the services were rendered the parties understood them to be part of a business transaction conducted for profit." Id.

Petitioners allege that Quest provided valuable investment, financial, and management consulting services to Norcom over an extended period of time. Petitioners further allege that in 1995 and 1996 they paid reasonable compensation to Quest for these services. Respondent takes the position that (1) Norcom lacked the requisite compensatory intent; and (2) the payments do not constitute reasonable compensation because petitioners failed to establish the extent of the services rendered. We disagree with respondent.

Intent To Compensate

The evidence strongly supports petitioners' contention that they intended to compensate Quest for services rendered when they made the $1 million payment in 1995 and the $700,000 payment in 1996. The Court finds it especially significant that both payments were initially negotiated by officers of Norcom and Quest who did not hold any ownership interest in either company. Specifically, Mr. Espy, chief operating officer of Quest, approached Mr. Rahn, president of Norcom, with the suggestion that Norcom compensate Quest for services rendered, whereupon Messrs. Espy and Rahn negotiated the amount of the payments. The Court sees no reason to second-guess payments that were negotiated by two disinterested members of the management teams

at Quest and Norcom.   Law Offices--Richard Ashare, P.C. v.
Commissioner, supra (declining to second-guess the wisdom of the
board of directors as to the amount of compensation paid to a
principal of the taxpayer).

There was also uncontroverted testimony by disinterested
parties that immediately before and after the 1995 payment was
made, Norcom intended it to be compensation for services
rendered.  Specifically, prior to making the 1995 payment,
Messrs. Arnold and Espy approached LaSalle to obtain the bank's
approval.  Loan officers at LaSalle testified that they were
informed that the payment was compensation for services
previously rendered by Quest.  Notably, LaSalle did not question
whether Quest had provided services to Norcom or the amount of
the payment.  Shortly after the 1995 payment was made to Quest,
petitioners' tax adviser learned of the payment and was told by
petitioners that the entire payment was compensation for services
rendered.

Additionally, the payments to Quest were contemplated by the
revised 1994 consulting agreement.[10]   That agreement provides

---

[10]   Petitioners alleged that the 1994 consulting agreement
was revised, but they were unable to locate a final signed
version of the allegedly revised agreement.  Petitioners did
produce a draft of the revised agreement.  On brief, respondent
urged the Court to find that the 1994 agreement included the
additional clause that petitioner claimed was part of the revised
agreement.  We interpret the parties' proposed findings of fact
(continued...)

that Norcom could make such compensation payments to Quest based upon the extent of the services provided by Quest.[11]  Notably, respondent has accepted the deductibility of other payments made under the 1994 consulting agreement.[12]

It is also clear that for both the 1995 and 1996 payments, Norcom followed its normal procedure for determining officer compensation.  Specifically, Norcom's president, Mr. Rahn, made a recommendation to Norcom's board of directors of the amount the salary and bonuses to be paid to Norcom's officers.  For both the 1995 and 1996 payments, Mr. Rahn was involved in determining the amount of compensation to be paid and in making a recommendation to Norcom's board of directors about such compensation.

Petitioners' claim that Norcom's payment of compensation to Quest was deferred until 1995 because its financial condition and financing arrangements precluded such payments is strongly supported by the evidence.  Prior to the change in ownership in

---

[10](...continued)
as a stipulation that the agreement was revised as alleged by the petitioners.  Although we are not bound by the parties' stipulated facts, the record is absent of facts indicating that the stipulation is clearly erroneous.  Rule 91(a); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976)

[11]  Similarly, the 1996 consulting agreement provides for the application of a formula to determine the amount of additional compensation payments Norcom would make to Quest.

[12]  Respondent has not alleged that these payments were contingent payments that are deductible only if they satisfy the test provided in sec. 1.162-7(b)(2), Income Tax Regs.

1987, Norcom had sustained years of operating losses. Although Norcom was restored to profitability after the acquisition, Norcom's ability to compensate Quest was limited. At all times it continued to be highly leveraged with millions of dollars of debt. The lender, Bank South, viewed Norcom as financially unstable and required Mr. Arnold to personally guarantee Norcom's loan. Although Norcom was profitable in the years after the ownership change, its financial condition was depleted in 1989 by the payment of a $1.6 million dividend, which was requested by Bank South. Norcom's poor financial condition is further evidenced by the fact it did not begin to compensate all of its officers until 1991.

The Bank South loan agreement expressly restricted the amount of compensation Norcom could pay to its officers and directors. Moreover, both the Bank South loan and the LaSalle loan limited Norcom's ability to make payments to related parties. As petitioners have alleged, Norcom's financial condition and its financing arrangements severely limited its ability to compensate Quest until Norcom's financial condition improved dramatically in 1995.

It is also clear that Norcom's management team lacked high-level financial planning expertise, at least after Mr. Lombardi resigned in early 1992. Instead of replacing Mr. Lombardi with an officer with a finance background, Norcom looked to Quest for

advice and counsel on financial and investment issues.  Numerous persons at Quest possessed relevant experience and training not found at Norcom.

Finally, with respect to both payments, Norcom's board of directors executed resolutions detailing that the payments were being made to Quest for valuable services Quest had previously provided to Norcom.  Both resolutions are consistent with the parties' conclusion that the 1994 agreement envisioned that Norcom's board could exercise its discretion and make additional compensation payments to Quest.

We find unpersuasive respondent's arguments that petitioners lacked the requisite compensatory intent.[13]  Respondent initially drew the Court's attention to the fact that only Mr. Arnold testified as to knowledge of a pre-1993 oral agreement between Norcom and Quest.  Respondent correctly notes that Mr. Lombardi, Norcom's CEO and president from 1987 through April 1992, testified that he had no knowledge of any oral agreement.  The Court chooses not to rely upon his testimony.  We find that Mr. Lombardi's testimony was biased because Mr. Lombardi had a

---

[13]  We note that respondent's briefs were not in accordance with Rule 151(e)(3), which governs proposed findings of fact, and could have been rejected.  Respondent's proposed findings of fact were rarely concise statements of fact and often were not based upon evidence.  Proposed findings of fact should not be based upon statements made in a request for admission (unless the subject matter of the request has been admitted or deemed admitted).

dispute with Mr. Arnold over their respective ownership interests in Norcom, as a result of which Mr. Lombardi resigned from Norcom and later sued Mr. Arnold.

Moreover, the lack of additional testimony regarding a pre-1993 agreement is neither surprising nor necessarily inconsistent with Norcom's having the requisite compensatory intent <u>at</u> <u>the</u> <u>time</u> the payments were made in 1995 and 1996. Closely held corporations often act informally, with decisions not being documented in writing. <u>Levenson & Kline, Inc. v. Commissioner</u>, 67 T.C. 694, 714 (1977); <u>Eyefull, Inc. v. Commissioner</u>, T.C. Memo. 1996-238. Additionally, in determining whether Norcom possessed the requisite intent, the relevant time is when the purported compensation payment was made. <u>Tool Producers, Inc. v. Commissioner</u>, T.C. Memo. 1995-407.[14] The Court finds it notable that numerous witnesses testified that before 1993 Quest was not paid by Norcom because Norcom's financial condition precluded it from compensating Quest. In any event, the substantial written documentation between the parties and the parties' actions demonstrate that Norcom possessed the requisite intent when it made the payments.

---

[14] Unlike in <u>Eyefull, Inc. v. Commissioner</u>, T.C. Memo. 1996-238, respondent has not alleged that Norcom and Quest lacked the necessary business relationship, such that Quest did not provide services with a view toward being compensated.

Respondent also alleges that numerous contracts limited Norcom's ability to compensate third parties, including Quest. Specifically, respondent calls the Court's attention to Norcom's Bank South loan agreement, which prohibited commissions, finder's fees, and investment banking fees, as well as Norcom's real estate contracts that prohibited payments of real estate broker commissions. These contracts do not suggest Norcom did not intend to compensate Quest. The services Quest provided to Norcom were similar to that of a chief financial officer, and we do not believe that compensation for such services was prohibited by these agreements.

Additionally, respondent claims that Norcom's intent to compensate Quest for services rendered before 1994 is capped at the $62,500 annual fee provided for in the 1994 consulting agreement, plus the amounts invoiced by Quest before the 1994 consulting agreement became effective. We do not find that Norcom intended to limit the compensation of Quest to these amounts. The 1994 consulting agreement expressly provides that Norcom will consider making compensation payments to Quest that are in addition to the required payment of $62,500. The agreement provides that such additional compensation is to be reflective of Quest's "involvement in and services provided to NORCOM." Moreover, there is nothing in the agreement that would

not permit Norcom to compensate Quest for services provided to Norcom before 1994.

We find that the circumstances underlying Norcom's payments to Quest in 1995 and 1996 confirm that the payments were made to compensate Quest for services rendered.

Reasonableness of the Compensation

The second element of the compensation test is whether the payments are reasonable in amount. Trinity Quarries, Inc. v. United States, 679 F.2d at 210; Estate of Wallace v. Commissioner, 95 T.C. at 553; Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38. Respondent has conceded that the payments were reasonable if petitioners substantiate that the services were provided as claimed.

To determine whether petitioners satisfied this condition, we must initially determine the extent of the services petitioners claimed to have received from Quest. In the petition, petitioners made the following claims regarding the services provided by Quest to Norcom: (1) Norcom hired Quest in the early 1990s, (2) Quest employed at least four senior level management advisers who worked with Norcom, and (3) Quest provided along with other services, the following: (i) analyzing Norcom's financing needs; (ii) hiring senior and key executives at Norcom; (iii) managing Norcom's facilities; (iv) negotiating

sales and leases on Norcom's behalf; and (v) developing Norcom's business plans.[15]

Petitioners established that Quest began to provide services at least as early as 1991, when Norcom began to reimburse Quest's expenses. Moreover, Quest's services to Norcom increased substantially in early 1992 after Mr. Lombardi resigned.

The evidence established that numerous senior-level Quest employees or consultants worked on Norcom matters, including Messrs. McColl, Espy, Arnold, Wright, and Cross (prior to his employment at Norcom). Additionally, numerous other Quest employees provided valuable services to Norcom in support of these individuals.

The evidence also establishes that Quest provided all of the services identified in the petition, plus many others. We find that petitioners have established that services were provided as claimed in the petition. Throughout the 1990s Quest worked on Norcom's financing needs. This includes attempts to find new

---

[15] Petitioners made essentially the same claims in a position paper provided to respondent during the audit. Conversely, respondent argues that petitioner must establish that

> Norcom was the largest client of Quest and its predecessor and that the personnel of Quest and its predecessor spent the majority of their time in performing services for Norcom.

The Court finds no indication in the record that petitioners made any such claims to this Court at the time that respondent made his concession. No such claims were made in the petition.

sources of equity financing and repeated work on Norcom's debt financing. Quest personnel were also very active in Norcom's equipment financing.

Quest also played a critical role in hiring the last two Norcom presidents. Mr. McColl hired both Mr. Cross and Mr. Rahn. Additionally, Mr. McColl himself assumed numerous offices at Norcom, without being paid by Norcom.

Quest played a very important role in negotiating Norcom's consolidation of its operations from four facilities down to a single, larger facility. Quest assisted in negotiating the purchase, sale, and leaseback of Norcom's plant. Quest personnel played similarly important roles in equipment acquisitions. Quest participated in the development of Norcom's business plans, particularly with respect to financing and investment issues. Quest reviewed numerous potential acquisitions for Norcom, which would have allowed Norcom to expand and diversify its business. Additionally, Quest hired Mr. Cross to provide a review of Norcom's operations after Mr. Lombardi resigned. We find that petitioners have established that services were provided as claimed in the petition and that respondent has conceded that the compensation was reasonable in amount. Accordingly, petitioners' payments of $1 million in 1995 and $700,000 in 1996 are deductible under section 162(a)(1) as ordinary and necessary expenses.

We have considered all arguments made by respondent, and to the extent not discussed above, we find them to be without merit. To reflect the foregoing,

<u>Decision will be entered for petitioners.</u>